UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

---

DELTA TURNER, LTD, a Michigan corporation

          Plaintiff,

v

GRAND RAPIDS – KENT COUNTY CONVENTION/ARENA AUTHORITY, a Michigan Municipal Authority, and SMG, a Pennsylvania General Partnership,

          Defendants.

_____/

Case No.1:08-CV-544

HONORABLE JANET T. NEFF

**ORAL ARGUMENT REQUESTED**

## PLAINTIFF'S CONSOLIDATED BRIEF IN OPPOSITON TO THE MOTIONS TO DISMISS OF DEFENDANTS SMG AND CAA[1]

## ORAL ARGUMENT REQUESTED

Plaintiff, Delta Turner, LTD, ("Delta"), by its attorneys, Silver & Van Essen, P.C., submits this Consolidated Brief in Opposition to the Motions to Dismiss filed by Defendants SMG ("SMG") and the Grand Rapids-Kent County Convention/Arena Authority ("CAA") under Fed. R. Civ. P. 12(b)(6).

### Introduction and Summary of Argument

CAA's and SMG's motions and supporting memoranda are ironic. As this Court knows, there are advantages and disadvantages to public entity status. The advantages include the availability of tax dollar funding, tax-free status, tax deductible eligibility for donations and varying levels of immunity from suit.

The disadvantages include requirements that decision-making be open, actions be limited to in scope, and that all documents generated in this process be accessible by the public. In their Fed. R. Civ. P. 12(b)(6) motions, Defendants ask this Court to recognize in their use of the Preferred Promoter Agreement with Live Nation ("PPA"), all the aforedescribed advantages of a public facility, while denying that there are any disadvantages. They claim that Competitor Arena Revenue Siphoning is so clearly within the limited public powers afforded to the CAA by the state legislature in the Convention Facility Authority Act ("CFAA") that the CAA and the private entity, SMG, should be declared "publicly immune" from suit with respect to this activity, while not denying that they consider every action they have taken and every document that they have generated regarding the this activity to be private, confidential secret and outside of public scrutiny.

The Defendants have no moral high ground, but do they control the legal high ground? The answer to this question is clearly "no," given the limitations of Fed. R. Civ. P. 12(b)(6) and a record that consists only of the First Amended Complaint ("FAC").

To confer state action immunity on the CAA and SMG, this Court would have to find that the Michigan legislature in 1999 in delegating authority to the CAA to operate the Van Andel Arena in the CFAA, not only intended and

[1] Delta consolidated its Response into one brief, because there was so much overlap in the arguments of the Defendants that to separately respond would have been confusing and duplicative. Delta

reasonably foresaw that the CAA would compete against the DeltaPlex for Arena Musical Products, but also foresaw that CAA would use it authority to operate the public Van Andel Arena as authorization to undertake concert promotional business activities without Delta's permission in the DeltaPlex, a private facility. In light of the FAC's allegation that the Competitor Arena Revenue Siphoning was not known to be occurring in any Michigan arena at the time the CFAA was enacted and is unauthorized in that Act [FAC ¶19], and the complete failure of the legislative history of the CFAA to contain any such discussion of such an unusual activity for the public sector, this Court cannot make such a finding.

Moreover, a municipality is *not* immunized from antitrust damage claims if it acts not just without authority, but also in *violation* of its authority, or if it completely fails to supervise its private agent. In order words, if the municipality has violated the law and has, therefore, not only engaged in unauthorized conduct but also wrongful conduct, or if it has permitted its private agent to act without supervision, it is *not* entitled immunity under the Local Government Antitrust Act ("LGAA") because there is "no official action directed by the local government," the statutory requirement.

The CFAA expressly requires that the CAA Board act for the CAA and, in so doing, conduct all business in meetings properly noticed and open to the public. Given Delta's allegations that CAA knowingly and intentionally violated

---

consulted with the Court's clerk regarding the combination of briefing pages into one brief.

this CFAA requirement in establishing the PPA, because it knew the public would not tolerate Competitor Arena Revenue Siphoning [FAC ¶38] and has completely failed to supervise SMG with respect to this behavior [FAC ¶48], the CAA should not be immunized from Delta's antitrust damage claims caused by the Competitor Arena Revenue Siphoning activity.

The immunity claims of the private entity SMG have further fatal flaws. In order for a private entity like SMG to take advantage of either state action or LGAA damage immunity, it must establish not only that its partner municipality has immunity, but also that it is directly and actively supervised by the State of Michigan (for state action immunity) and the partner municipality (for LGAA damage immunity). Since the FAC alleges that there is no State or CAA supervision of SMG in the development, execution or implementation of the Competitor Arena Siphoning provisions of the PPA [FAC ¶20, ¶48], SMG is *not* entitled to state action or LGAA damage immunity on a Fed. R. Civ. P. 12(b)(6) motion.

As to antitrust pleading requirements, the FAC pleads a relevant service product—the hosting of large indoor musical concerts attracting in excess of 3,000 patrons [FAC ¶8], in a relevant market—the West Michigan metropolitan areas of Battle Creek, Kalamazoo, Grand Rapids and Muskegon [FAC ¶8]. It also pleads that the Competitor Arena Revenue Siphoning features of the PPA are unusual and perhaps unique to the CAA [FAC ¶19], were suggested and developed by the CAA and SMG, not the promoter Live Nation [FAC ¶21], are

4

exclusive and unavailable to any of the Van Andel Arena's West Michigan Competitors including Delta [FAC ¶26, ¶43], were intended to give Van Andel a monopoly [FAC ¶¶29-30], and have actually given the Van Andel Arena up to an 80% market share over the Arena Service Products in the Market. [FAC ¶32]. This is more than sufficient to state a *prima facie* antitrust claim.

In its 42 U.S.C. §1983 claim, Delta is **not** complaining that it has to compete with the CAA for Live Nation events, despite CAA's inherent funding and tax advantages—which already give it an uneven playing field. Rather, Delta's §1983 complaint is that CAA's Competitor Arena Revenue Siphoning from events at the DeltaPlex is in effect an illegal tax on the DeltaPlex, taking revenues that Delta would otherwise earn from concerts actually placed at the DeltaPlex and denying it revenues from concerts that would otherwise be placed at the DeltaPlex but now either don't come to Grand Rapids or if they do come, are placed at Van Andel Arena, thereby substantially diminishing the overall property value of the DeltaPlex, and impairing its legitimate investment backed expectations. [FAC ¶¶64-66]. This is an adequate pleading of property rights that are being improperly taken by the public entity without compensation, a violation of that entity's 5th Amendment substantive due process rights as applied to CAA through the 14th Amendment and actionable under 42 U.S.C. §1983.

Finally, Delta has adequately pled a host of state law claims that are all intimately tied to a resolution of the federal antitrust and constitutional claims

because under state law, the PPA in concept and execution is wrongful, unauthorized, unsanctioned, unintended and unforeseen. This Court's pendent jurisdiction was intended to cover state law claims that are interwoven with the issues presented by federal claims—exactly the situation in this case.

## Relevant Legal Standard

A motion to dismiss under a Rule 12(b)(6) tests the sufficiency of the pleading. *Davis H. Elliot Co., Inc. v. Caribbean Utils. Co.,* 513 F.2d 1176, 1182 (6th Cir.1975). A Rule 12(b)(6) motion does not attack the merits of the case. It merely challenges the pleader's failure to state a claim properly. 5A Wright, Miller & Kane, *Federal Practice and Procedure* § 1364, at 340 (Supp.1990). In deciding a 12(b)(6) motion, the court must determine whether plaintiffs' complaint sets forth sufficient allegations to establish a claim for relief. The court must accept all allegations in the complaint at "face value" and construe them in the light most favorable to plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983), *cert. denied,* 469 U.S. 826 (1984).

The complaint must set forth enough information to outline the elements of a claim or to permit inferences to be drawn that these elements exist. *Jenkins v. McKeithen,* 395 U.S. 411 (1969). The court cannot dismiss plaintiffs' complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, (1957). Dismissal pursuant to a Rule

12(b)(6) motion is proper only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Bloch v. Ribar,* 156 F.3d 673, 677 (6th Cir.1998).

Even if a technical defect in a pleading is found on a Rule 12(b)(6) motion, "'...the court normally will give plaintiff leave to file an amended complaint.' 5A Wright & Miller, *Federal Practice & Procedure* § 1357 (2d ed.1990 & supp.2002). Granting leave freely under Rule 15 'reinforce[s] the principle that cases should be tried on their merits rather than the technicalities of pleadings.' *Tefft v. Seward,* 689 F.2d 637, 639 (6th Cir.1982)," as quoted in *Broughton v. St. John Health System,* 246 F.Supp.2d 764, 775 (E.D.Mich. 2003).

## Statement of Facts

Among the most relevant facts that must be considered as true when the Court considers this Motion are the following:

1. The Competitor Arena Revenue Siphoning feature was unknown and unusual if not unique to the PPA, when the Van Andel Arena was authorized by the Michigan legislature in 1999. [FAC ¶19].

2. The service product involved in this case is the hosting of large, nationally touring indoor musical concerts seeking event patrons in excess of 3,000 ("Arena Musical Product"). [FAC ¶8].

3. The CAA and SMG recognize a distinct geographic market consisting of the West Michigan metropolitan areas of Battle Creek, Kalamazoo,

Muskegon and Grand Rapids and virtually all attendees at the Arena Musical Products within the Market are residents of the Market. [FAC ¶¶8-10].

4. The Competitor Arena Revenue Siphoning in the PPA is directed at the DeltaPlex, Wings Stadium, Kellogg Center, and L.C. Walker Arena, the major competitors of Van Andel Arena in the Market. [FAC ¶9, ¶17].

5. SMG and agents of the CAA developed the Competitor Arena Revenue Siphoning provisions of the PPA with the intention of gaining monopoly over the Arena Musical Product in the Market. [FAC ¶29].

6. Neither Delta nor any of the Van Andel Arena's West Michigan Competitors would be able to negotiate a similar competitive arena revenue siphoning provision with Live Nation because Live Nation could not and would not devote another third of its Arena Musical Product revenue to another arena operator. [FAC ¶26, ¶43].

7. Indeed, through the PPA, the CAA and SMG control all or virtually all Arena Musical Products in the Market, and the Arena Musical Products are only placed in Van Andel Arena's West Michigan Competitors when there is another event at the Van Andel Arena. Indeed, Live Nation controls as much as 80% of the Arena Musical Products in the Market. [FAC ¶32].

8. Delta has been unable to make up for the Arena Musical Products lost to the Competitor Arena Revenue Sharing provisions of the PPA with non-musical products. [FAC ¶33].

9.    The effects of the PPA and the Competitor Arena Revenue Siphoning include the fact that some events that would otherwise come to West Michigan do not come to West Michigan at all, or if they do come to Van Andel Arena's West Michigan Competitors, they come at a higher cost to the owners of those arenas and/or to the concert patrons because Live Nation has to increase the fees or costs it charges in order to cover the "cut" that the PPA requires for the CAA from events taking place at the DeltaPlex, Kellogg Arena, Wings Stadium and L.C. Walker Arena. [FAC ¶30].  This effect is detrimental to the public in the Market by denying it access to the Arena Musical Product ("output") and/or increasing the costs of the Arena Musical Product ("price"). [FAC ¶30]. Since many, if not most of these events, are based outside of the state of Michigan, the PPA has, and will continue to have unless enjoined, a substantial, negative impact on the flow of interstate commerce.  [FAC ¶31].

10.    The Competitor Arena Revenue Siphoning and in the PPA has proximately caused Delta damages in two ways:

(a)    by taking revenues and profits that it would otherwise earn from contracts with Live Nation; and

(b)    by decreasing the property value of the DeltaPlex.   Indeed, Delta is unable to rent the DeltaPlex out to a sufficient number of conventions, trade shows or non Arena Musical Products to make up for the loss of Arena Musical Products

to the Van Andel Arena caused by the PPA, thereby diminishing the property value of the DeltaPlex. [FAC ¶64].

11. Delta purchased and redeveloped the DeltaPlex with the reasonable expectation that it would obtain its competitive share of Arena Market Products and without any expectation of revenue siphoning by CAA. [FAC ¶63, ¶66]. By denying the DeltaPlex its competitive share of the Market and publicly siphoning revenue generated from the DeltaPlex, the Competitor Arena Revenue Sharing has impaired Delta's reasonable, investment backed expectations. [FAC ¶65, ¶66].

12. The CAA Board has never considered the PPA at a properly noticed, public meeting and attorneys for the CAA Board are holding all correspondence and documentation regarding the PPA in their offices so that the CAA can avoid the strictures of Michigan's Open Meetings Act and Freedom of Information Act. [FAC ¶35, ¶100].

13. Neither the State of Michigan nor the CAA Board performs any supervision of SMG in the development or implementation of Competitor Arena Revenue Siphoning. [FAC ¶20, ¶48].

## Argument

**1.    State Action Immunity is not available to CAA or SMG.**

SMG and CAA each rely on *Electrical Inspectors, Inc. v. Village of East Hills,* 320 F.3d 110 (2nd Cir. 2003) in support of their state action immunity defense. However, an application of the two-pronged standard articulated in

that case compels this Court to deny the state action immunity defense, at least on a 12(b)(6) motion:

> "[M]unicipalities that wish to avail themselves of *Parker* immunity must show that their regulations were authorized by the state. The requisite showing of authority has two components: First, the municipality must have 'authority to regulate'; second, it must have 'authority to suppress competition.'"

320 F.3d at 118.

## A. The CAA has no public authority to promote concerts in a private facility.

Contrary to the arguments of CAA and SMG, nothing in the CFAA or any other statute would confer upon the CAA the authority to copromote rock concerts at the private DeltaPlex, a facility in which the CFAA does *not* grant authority to the CAA to operate. Rather, the CFAA's grant of authority to the CAA is limited to arena activities that are physically connected or appurtenant to the Van Andel Arena. As the CAA acknowledges, the CFAA was expressly enacted for the purposes of conveying authority in the City of Grand Rapids and Kent County to create the CAA, and without it, the CAA would have no authority at all. [CAA Brief, pp. 5-6]. The power of the CAA to operate musical concerts in Van Andel is itself one-step removed from its statutory authority, because CFAA's stated purpose is for the CAA to operate a *public arena* to promote *conventions and tourism* and musical concerts do neither, since they serve local residents:

> The legislature of this state finds that there exists in this state a continuing need for programs to promote *tourism and convention*

> **business** in order to assist in the prevention of unemployment and alleviation of the conditions of unemployment, to preserve existing jobs, and to create new jobs to meet the employment demands of population growth. To achieve these purposes, it is necessary to assist an encourage local units of government to acquire, construct improve, enlarge, renew, replace, repair, finance, furnish, and equip **convention facilities** and the **real property on which they are located** to refinance these activities.

MCL §141.1402 [Emphasis Added].

That there be at least some nexus between the CAA's authorized activity and the physical area of the public arena is further emphasized by the state legislature in its CFAA definition of "convention facility," which limits the concept to the actual arena space and "appurtenant property" that is "necessary and convenient for use with the convention facility:"

> "Convention facility" means all or any part of, or any combination of, a convention hall, auditorium, **arena,** meeting rooms, exhibition area, and related **adjacent public areas** that are generally available to the public for lease on a short-term basis for holding conventions, meetings, exhibits, and similar events, together with **appurtenant property**, including parking lots or structures, **necessary and convenient for use in connection with the convention facility**."

MCL §141.1403(c) [Emphasis Added].[2]

While the CAA and SMG are quick to cite CFAA Section 8(c) which confers contractual authority in the CAA Board, they completely ignore the preamble of Section 8, which requires that the CAA Board exercise all power of

---

[2] The CFAA's conferral of authority in the CAA to undertake activities requires a line to be drawn somewhere. While Delta is not challenging the CAA's authority to hold musical concerts at the Van Andel Arena, it is worth noting that a strict construction of the CFAA could lead to a different result, since concert hosting authority is not expressly conferred in the CFAA. Delta's position that the Court should interpret the CFAA as limiting the CAA's proprietary authority to the Van Andel

the CAA and ties such powers to the purposes of the CFAA, which are the promotion of tourism and conventions through **the operation of a public arena and appurtenant real property**, and merely authorize the CAA Board to identify which authorities may "sign" a contract on its behalf. MCL §141.1408(1)(c).

As this Court knows, *Charlie's Crab* is a high end, stand alone destination restaurant located two blocks from the Van Andel Arena. It might be convenient for the Van Andel Arena to have such a restaurant in the neighborhood, but there is no way that CAA could justify the public purchase or public operation of *Charlie's Crab* as being necessary or appurtenant to Van Andel Arena as envisioned under the CFAA. Likewise, there is nothing necessary or appurtenant to Van Andel Arena in the co-promotion of musical concerts at DeltaPlex, which is approximately 5 miles from Van Andel Arena in a different city, Walker. [FAC ¶7].

Accordingly, the CAA and SMG cannot meet the first prong of state action immunity; namely, state authorization to engage in the particular activity challenged.

> **B.** **The anti-competitive effects of the Competitor Arena Revenue Siphoning was not "clearly articulated or affirmatively authorized" by the Michigan legislature.**

---

Arena and activities physically appurtenant or directly connected to events at the Arena is properly viewed as a moderate or liberal interpretation of CAA's authority.

CAA and its agent SMG also cannot meet the second prong of state action immunity as articulated in *Electrical Inspectors*; namely, that the "authority to suppress competition" through the co-promotion of concerts at the DeltaPlex or other private arenas was reasonably foreseeable and expected by the state legislature when it conferred authority in the  CAA to operate the public Van Andel Arena.

In this regard, the Court should first note that SMG's interpretation of the Sixth Circuit's Opinion in *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527 (6th Cir 2002) would render that Opinion in direct conflict with the holding of the United States Supreme Court in *Community Communications Co., Inc. v. City of Boulder, Colo.*, 455 U.S. 40 (1982) and would defeat the **limited** purpose of the United States Congress in the Local Government Antitrust Act ("LGAA"), which was to insulate certain municipal actions from **damage** liability, while retaining the United States Supreme Court's restrictions on state action immunity as articulated in *City of Boulder* with respect to **nondamage relief**.  Put differently, if SMG's view of the law was correct; namely, that broad grants of general authority such as through the home rule cities act immunized public entities from any antitrust relief, there would be no need for the LGAA's more limited grant of damage immunity.

In *City of Boulder,* the United States Supreme Court rejected SMG's argument that broad, general grants of municipal authority such as through a home rule cities act can be used by a municipality to satisfy the state action

14

immunity requirement that the municipalities' anticompetitive action be "clearly articulated and affirmatively authorized" by the state government. Mere "neutrality" or silence by the legislature is insufficient to confer immunity:

> But plainly the requirement of "clear articulation and affirmative expression" is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive. A State that allows its municipalities to do as they please can hardly be said to have "contemplated" the specific anticompetitive actions for which municipal liability is sought. Nor can those actions be truly described as "comprehended within the powers *granted*," since the term, "granted," necessarily implies an affirmative addressing of the subject by the State. The State did not do so here: The relationship of the State of Colorado to Boulder's moratorium ordinance is one of precise neutrality.

455 U.S. at 55.

The lesson of the *City of Boulder* decision is that before state action immunity may be found, the public actor must be able to cite to **specific** statutory authority from which the Court can infer that the **legislature expected** the acts complained of, as well as their **anticompetitive effects**. In this case, the particular provision of the PPA attacked in this lawsuit is the Competitor Arena Revenue Siphoning. Delta firmly believes that the state legislature would be aghast that the City of Grand Rapids and Kent County would cite their authority to operate Van Andel Arena under the CFAA as "clear and affirmative" state authorization to risk public dollars in the co-promotion of a Kid Rock concert in the private DeltaPlex and the anti-competitive effects that such co-promotion occasions, namely, discouraging Live Nation from using the DeltaPlex. [FAC ¶19, ¶22]. However, the most that SMG or the CAA can argue

is that the state of Michigan is neutral or silent on whether CFAA's broad grant of authority to operate the Van Andel Arena to promote convention and tourism in West Michigan conveys the power to control revenues generated from concerts held at the private DeltaPlex.  This best case scenario for the CAA squarely places the PPA within the precedent of the *City of Boulder,* and compels a denial of its 12(b)(6) motion.

Indeed, it is inherently circular for the CAA and SMG to argue that since CAA has **some** contractual power, it has the right to state action immunity for **any** contractual provision it dreams up to strengthen the financial position of Van Andel Arena, regardless of how unforeseeable, unexpected, and remotely attenuated to the actual powers conferred by the statue legislature, particularly where those activities are 5 miles away in a private arena.  After all, a contract to run a bordello next to Van Andel Arena might improve convention and tourism activities as well as attendance at Van Andel Arena musical concerts, but would hardly be a foreseeable contract envisioned by the state legislature in the CFAA and that would be thereby immunized.

Given the unusual, unexpected and perhaps unique nature of the Competitor Arena Revenue Siphoning, this Court cannot find on 12(b)(6) motion that the Michigan state legislature clearly articulated and affirmatively authorized its anticompetitive effects as would be required to cloak the activity with state action immunity.

**C.** **Additionally, SMG is not regulated by the State of Michigan with regard to the Competitor Arena Revenue Siphoning.**

SMG has a heavier burden than the CAA in invoking state action immunity. It must show both the elements that the CAA must show as noted above—which it cannot--**and** it must show that it was actively supervised by the ***state of Michigan,*** which is the so-called "second prong" in state action immunity as articulated by the United States Supreme Court in *California Real Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97 (1980). Although the CAA and SMG correctly note that state supervision is not a factor when the municipality is the actor, they fail to acknowledge that this element remains a requirement where—as in the present case—a private entity is the agent actor for the municipality. In that situation, the private party must show direct "state," not just municipal, supervision:

> "If the private actor was the effective decision maker, due to corruption of the decision-making process or delegation of decision-making authority, then it is not immune, unless it can show that it was actively supervised by the ***state.***"

See *Michigan Paytel Joint Venture v. City of Detroit,* 287 F.3d 527, 538 (6th Cir. 2002)[Emphasis Added].

The United States Supreme Court explained why it was requiring active state supervision with respect to private entity claims for state action immunity and not with respect to municipalities in *Town of Hallie v. City of Eau Claire,*

471 U.S. 34, 47 (1985); namely, that private entities are particularly removed from seeking the public interest inherent behind the state action immunity:

> "'The only real danger is that [the municipality] will seek to further purely parochial public interests at the expense of more overriding state goals.' By way of contrast, when 'a private party is engaging in the anti-competitive activity, there is a real danger that he is acting to further his own interests rather than the governmental interests of the State.'"

*Hallie, supra,* As quoted in FN 9 of *Electrical Inspectors, supra,* 320 F.3d at 124.

As noted above, there is nothing that even anticipates Competitor Arena Revenue Siphoning by CAA in the CFAA, much less prescribes state limitations or regulations on that activity if carried out by private agents such as SMG. Further, there are no regulations that have been promulgated on this subject by the State of Michigan, which performs no supervision over the operations of the CAA. [FAC ¶20]. In fact, the SFA Bill Analysis for SB 867 (First Analysis), which CAA cites, notes that the only state involvement with Van Andel Arena was the original appropriation of $62 million and that the bill if enacted, "would have no direct State fiscal impact." *Id.,* p. 4. Thus, Michigan performs no supervision of SMG relative to the PPA, precluding SMG from claiming state action immunity.

**2.     The Local Government Antitrust Act does not shield CAA or SMG at this stage from Delta's damage claims.**

The Local Government Antitrust Act ("LGAA"), 15 U.S.C. §36(a) only immunizes against antitrust damage claims where the municipality has ***actually exercised*** its authority ***without expressly violating that***

***authority***, [*Montauk-Caribbean Airways, Inc. v. Hope,* 784 F.2d 91, 95 (2nd Cir. 1986)] ***and*** where it is ***actively supervising*** the private party acting on its behalf. *CF Gaming, Corp. v. City of Black Hawk, Colorado,* 405 F.3d 876, 886-887 (10th Cir. 2005). These conditions flow directly from the statutory language at issue, which precludes monetary damages "in any claim against a person based on any official action ***directed*** by a local government." 15 U.S.C. §36(a)(Emphasis added).

In asserting LGAA immunity, SMG and CAA rely on *Black Hawk* and the case it relies on, *Sandcrest Outpatient Services, P.A. v. Cumberland County Hosp. Systems, Inc.,* 853 F.2d 1139 (4th Cir. 1988). While LGAA immunity was applied in each of those cases to the public entity, this was true ***only*** because the courts found—drawing on the legislative history of the LGAA--that the underlying authority exercised by the local officials was actually exercised, was "lawful," and was "reasonably consistent with the general responsibilities of the position." See *Black Hawk*, supra, 405 F.3d at 885; *Sandcrest, supra,* 853 F.2d at 1143-1144. In fact, in *Black Hawk,* the 10th Circuit effectively distinguished the allegations presented in that case from the facts alleged by Delta:

> "The legislative history of the LGAA, however, demonstrates that Congress intended the phrase 'acting in an official capacity' to be given broad meaning encompassing all 'lawful actions, undertaken in the course of a defendant's performance of his duties, that reasonably can be construed to be within the scope of his duties and consistent with the general responsibilities and objectives of his position. *Sandcrest Outpatient Svcs., P.A. v. Cumberland County Hosp. Sys., Inc.,* 853 F.2d 1139, 1145 (4th Cir. 1988). In this case, plaintiffs do not allege that the city officials lacked the authority to cause the city of Black Hawk to sell

the undivided interests in the mining claims or to withhold Winn's certificate of occupancy. Their only contention is that in exercising these legitimate powers the city officials acted pursuant to an illegitimate motive.

405 3d at 885.

In this case, in contrast to *Black Hawk*, Delta is contending that Competitor Arena Revenue Siphoning is not remotely, much less reasonably, included within the CAA's CFAA authority. [FAC ¶19, ¶74]. Additionally, Delta is asserting that the CAA acted "unlawfully" and has never directed or supervised the activities of its agent, SMG, on this subject, so that there is no "official action directed by local government" that can be immunized. [FAC ¶23, ¶48].

The CFAA requires that the CAA's powers and duties "shall be exercised" by a board of directors, MCL §141.1405, and that the board "shall conduct all business at public meetings held in compliance with the open meetings act." MCL §141.1407(1). Delta clearly alleges that the CAA violated these provisions with respect to the PPA. [FAC ¶35]. Stated simply, the CAA cannot claim LGAA "official act" immunity when it not only acts without authority, but acts in direct violation of its authority, which is exactly what Delta has alleged and will prove.

Defendants exaggerate the holding in *Interface Group, Inc. v. Mass. Port Authority,* 816 F.2d 9, 13 (1st Cir. 1987) in an improper effort to sweep their illegal acts under the rug of locally directed action subject to damage

immunity. In that case, the First Circuit Court of Appeals used the terms "ordinary," "non-obvious" and "misjudgments" to describe the mistaken exercises of official action that would be protected by the LGAA. The violations of the CFAA asserted by Delta in this case, however, are extraordinary, obvious, intentional, calculated and were not even undertaken by the CAA, but rather by an undirected SMG. [See FAC ¶23; ¶¶35-38]. If some flexibility must be given to municipalities with respect to LGAA's requirement that the action be "official" and "lawful," in order to advance the LGAA's purposes, it must also be said on the other end of the spectrum, that some public actions are so blatantly undirected, unsupervised and violative of state law that they cannot be said to be "official action directed by local government" without violence to the plain language of the statute and the legislative history as noted above. Delta's antitrust damage claims against the CAA present the unusual situation where the LGAA's clear statutory language is not met.

As with state action immunity, Delta's claims that SMG is not entitled to LGAA damage immunity have an additional element. In order to avail itself of LGAA immunity the private entity, SMG must prove that it is actively supervised with respect to the Competitor Arena Revenue Siphoning by CAA's Board. Again, the *Black Hawk* case relied upon by SMG articulates the standard:

> "The Conference Report of the LGAA, explicitly agreed to by both houses of Congress, explains that the phrase 'official action directed by' found in *Parker* and subsequent cases interpreting it 'shall apply by analogy to the

conduct of a local government in directing the actions of non-governmental parties, as if the local government were the state.' H.R. Conf. Rep. No. 98-1158, *reprinted in* 1984 U.S.C.C.A.N. 4602, 4627; *see also Sandcrest,* 853 F.2d at 1143. Applying the two-part test by analogy to the private defendants here, the relevant questions therefore become: (1) whether the challenged restrain was the clearly articulated and affirmatively expressed policy of Black Hawk, and (2) whether the policy was actively supervised by Black Hawk.

405 F.3d at 886.

Delta alleges in its FAC that the CAA has never established Competitor Arena Revenue Siphoning as a policy, much less performed any supervision of SMG relative to this activity at DeltaPlex. [FAC ¶35; ¶48]. Since the CAA doesn't have any record of either adopting the Competitor Arena Revenue Siphoning as a policy, much less the authorizing its application to the Delta Plex or supervising SMG in that application, and since the CAA is obligated to act in public and through its Board, it is hard to envision that SMG could develop any facts that would possibly lead to the application of LGAA immunity to it in this case. Certainly, it cannot establish entitlement to that immunity on a 12(b)(6) motion.

**3.     Delta has sufficiently pled the elements of an antitrust action.**

SMG grossly exaggerates the United States Supreme Court's holding in *Bell Atlantic Corp. v. Twombly,* ___ U.S. _____, 127 S.Ct. 1955 (2007). *Twombly* simply clarified that the "no set of facts" language of its landmark 12(b)(6) opinion in *Conley v. Gibson,* 355 U.S. 41 (1957) which it did not reverse, should

not be read as relieving a plaintiff of pleading facts that, if true, would *plausibly* lead to ultimate relief to survive 12(b)(6) standards:

> While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, *ibid.,* a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Applying these general standards to a *§ 1* claim, stating a claim requires a complaint with enough factual matter to suggest an agreement. Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects *Rule 8(a)(2)*'s threshold requirement that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief."

127 S.Ct. at 1959.

In fact, in *Twombly*, the Supreme Court expressly *rejected* the defendants' invitation to find that there is a heightened pleading requirement in federal anti-trust cases. 127 S.Ct. at 1973, FN 14. The plaintiffs in *Twombly* had merely pled that the local telephone companies after divestiture had failed to compete, not that they actually competed in an unlawful manner. Plaintiffs assumed that the defendants' failure to enter markets was the result of a *tacit* conspiracy. The Supreme Court noted that it was also just as plausible to infer that the local telephone companies were being conservative in not entering new markets. As noted below in more detail, in contrast to the plaintiffs in *Twombly*, Delta has pled anti-trust **activities** (as opposed to inactivity) that are plausible and if true, should lead to anti-trust relief.

**A. Delta has sufficiently pled the interchangeable product and geographic market.**

As noted above, the FAC pleads a relevant service product—the hosting of large indoor musical concerts by nationally touring country and rock artists attracting in excess of 3,000 paying patrons [FAC ¶8], in a relevant market—the West Michigan metropolitan areas of Battle Creek, Kalamazoo, Grand Rapids and Muskegon [FAC ¶8]. It also pleads that the Competitor Arena Revenue Siphoning features of the PPA were unknown and are unusual, if not unique to the CAA [FAC ¶19], were suggested and developed by the CAA and SMG, not Live Nation [FAC ¶21], are exclusive and unavailable to any of the Van Andel Arena's West Michigan Competitors including Delta [FAC ¶26], were intended to give Van Andel a monopoly [FAC ¶29], and have actually given the Van Andel Arena a monopoly over the service product in the Market. [FAC ¶32]. These allegations more than meet the *Twombly* plausibility standard.

Defendants do not deny that that the arena hosting[3] of nationally touring country and rock groups with paying patrons of at least 3,000 for a concert is a distinct product. In fact, the Defendants originally cited the European musical group, the "Police" as an example of the relevant product that would be

---

[3] SMG originally suggested that because the musical group "Police" may choose  to play outside of West Michigan if the PPA drives up the cost of playing at the Van Andel Arena's West Michigan Competitors, the geographic nature of the West Michigan market is obviously fallacious. [SMG's Original Brief, p. 17]. This is illogical. The Police may in fact choose to play in Ft. Wayne  if  it cannot book Van Andel Arena and the West Michigan Arena Competitors' rates are prohibitively high because of the PPA, or it may choose not to play at all on a given date, but either way, the West Michigan Market has suffered. SMG's argument ignores the fact

available for the West Michigan Market. [SMG's Original Brief, p. 16]. In their amended briefing, Defendants attack Delta's FAC for not pleading the conclusion that the DeltaPlex and three other West Michigan Competitors to the Van Andel Arena offer arenas that are "reasonably interchangeable" and because it has not pled the conclusion that the DeltaPlex's nonmusical concert market is not sufficiently "inelastic" to make up for musical arena concerts lost to the PPA and Van Andel Arena with nonmusical arena events (SMG Brief, p.17).

These arguments blatantly ignore the fact that Delta has specifically pled **_the fact_** that the Delta and the three other West Michigan Competitors victimized by the Competitor Arena Revenue Siphoning specifically compete for Arena Musical Products [FAC ¶¶9-10] and **_the fact_** that Delta has been unable to replace the lost Arena Musical Products caused by the Competitor Arena Revenue Siphoning with other non-Musical Events. [FAC ¶33]. Defendants fail to address either of these pled allegations, because they know that these allegations are fatal to their argument on product interchangeability and cross inelasticity.

Indeed, having singled out "music and concert and other entertainment events" and the DeltaPlex and three other West Michigan Competitors in the PPA, the CAA and SMG are estopped from denying—at least on 12(b)(6)

---

that CAA might prefer that the Police not play at all in West Michigan, rather than have to compete with a Van Andel event.

motion—that such a market exists and that its products are interchangeable and inelastic. This was the holding in *Todd v. Exxon Corp.,*275 F.3d 191 (2nd Cir. 2001) wherein the Second Circuit of Appeals reversed the district court's grant of a 12(b)(6) motion. In *Todd,* the defendant oil companies circulated wage information regarding the employment positions that they offered and then convinced the district court that the plaintiffs' allegation of a distinct labor market for oil company workers was implausible as a matter of law.

Relying on a Sixth Circuit case out of this district involving Delta's counsel, *Foundation for Interior Design Educational Research v. Savannah Coll. of Art & Design,* 244 F.3d 521, 531 (6th Cir.2001), the Second Circuit first noted that the definition of "product market" and inelasticity require an intensely factual review that in most cases is not amenable to a 12(b)(6) motion, especially where Plaintiff has pled market products that are competitive with the defendants' products and an inability to replace its products constrained in the market with alternative products—exactly what Delta has pled, as noted above. 275 F.3d at 200.

The Second Circuit further noted that the very fact that the defendants chose to "recognize the market" in the disputed practice gives the existence of that market, at least for pleading purposes, sufficient plausibility to overcome a 12(b)(6) challenge. 275 F.3d at 205. This is exactly the situation alleged by Delta, when it notes that CAA, SMG and Live Nation defined the relevant product and market in their PPA to include musical events and other

entertainment at Delta and the three other local competitors of Van Andel in the Competitor Arena Revenue Siphoning practice that is challenged in the FAC. [FAC¶17).

Indeed, Delta has expressly pled that the SMG and/or CAA, rather than Live Nation, initiated the PPA's description of the product and market, and that the Defendants' intended purpose through the PPA was so that they could gain monopolistic control over those markets at Van Andel Arena. [FAC ¶21, ¶29]. Having so recognized the product and market as sufficiently interchangeable and plausible in their own contract with Live Nation, Defendants cannot deny that Delta has sufficiently pled this element or that its product or market are illogical and implausible as a matter of law.

The fact that there are other distinct geographic markets in other regions of the United States for Arena Musical Products doesn't destroy, but actually strengthens Delta's claims. Again, the case relied upon by Defendants, *Michigan Division-Monument Builders of North America v. Michigan Cemetery Ass'n*, 524 F.3d 726 (6th Cir. 2008), hurts rather than supports their argument. In *Monument Builders,* the plaintiff asserted that each cemetery in Michigan was its own separate geographic market. The 6th Circuit rejected that claim, citing with approval the 8th Circuit's observation in *Double D. Spotting Services, Inc. v. Supervalu, Inc.,* 136 F. 3d 554, 560 (8th Cir. 1998) that a geographic market is a function of the product market, and reflects the "geographic area in which consumers can practically seek alternative sources of the product."

Acknowledging that "[m]arket definition is a highly fact-based analysis that generally requires discovery,"[4] the 6th Circuit noted that one facility is too narrow to constitute a geographic unit, suggesting that if the plaintiffs had pled a geographic unit consisting of cemeteries in a metropolitan area, the result would have been different. *Monument Builders,* 524 F.3d at 736.

In this case, as noted above, Delta has pled that there are 5 facilities that are major competitors of each other within a 60 mile radius, which is the practical limit where a distinct population is likely to seek alterative sources for an evening concert. [FAC ¶¶8-10]. Delta has pled a logical product and a plausible market that are more than sufficient to survive a 12(b)(6) Motion.

**B.    Delta has pled a sufficient anti-trust injury.**

The essence of Defendants' argument here is two-fold: first, they argue that they are guilty of nothing more than entering into a nonexclusive competitive arrangement with Live Nation that Delta and the other West Michigan Arena Competitors would be free to similarly negotiate with Live Nation, and second, because the PPA does not directly increase arena rental rates, it can have no anticompetitive effect as a matter of law. (SMG Brief, pp. 18-21).

Defendants ignore the economic realities of the market that Delta has pled or the collusive effect that Defendants' association has had on the competitive market. Delta's argument is that by artificially inserting itself into

---

[4] *Foundation for Interior Design Educ. Research, supra,* 244 F.3d at 531.

the "overhead" at the DeltaPlex and other West Michigan Arena Competitors, the CAA and SMG have driven up ticket prices at the DeltaPlex and the other West Michigan Arena Competitors, injuring and diminishing their market share and compromising public interests by either driving up ticket prices or diminishing output—i.e. discouraging some concerts from coming to the West Michigan Market. [FAC ¶30]. Delta further alleges that there is no room in the marketplace for Delta or any of its non-Van Andel Arena competitors to take another one-third (1/3) of Live Nation's gross profits for Arena Market Products generated from other arenas in the Market. [FAC ¶26; ¶43].

In attempting to fragment the product and market to only look at arena rental rates, Defendants commit the same error that was reversed in *Todd, supra.* In that case, the defendants cited the fact that wages had indisputably increased to argue that they could not be plausibly accused of "buyer" suppression of market prices. The Second Circuit rejected that argument and found that the district court reversibly erred by ignoring the "structure of the industry," and the effect of "tacit collusion" among the integrated industry operators who were suppressing the market:

> The Supreme Court in *Gypsum* explained that one of the two "most prominent[ ]" factors in the rule of reason analysis of a data exchange is "the structure of the industry involved." 438 U.S. at 441 n. 16, 98 S.Ct. 2864. Therefore, once the relevant market is defined, a court must analyze the structure of that market to determine whether it is "susceptible to the exercise of market power through tacit coordination."

275 F.3d at 208.

In the arena musical event market, the overall product or ticket costs are obviously a function of the promoter's costs as well as the arena rates. Moreover, Live Nation's interest in the DeltaPlex is a function of what it will pay to Delta and the CAA.   In their market analysis, the Defendants, like the reversed district Court in *Todd,* completely ignore the collusion and the adverse impact on pricing and supply of that vertical integration that Delta has pled, which ultimately adversely affects both the horizontal competition among West Michigan Arena Competitors and the public interest, namely, higher ticket prices and a reduced number of musical concert products at the DeltaPlex and in the market.   [FAC ¶30].

The fact that arena rental rates outside the Van Andel Arena are being suppressed by the PPA doesn't mean that increased arena competition and lowered ticket costs are the result. Just the opposite is true.  The intrusion of an additional, third party—the CAA and SMG--into the market cost equation at the West Michigan Arena Competitors is driving up costs, suppressing competition and increasing product costs.   This cost increasing and market suppression result of the Competitor Arena Revenue Siphoning feature of the PPA materially distinguishes it from each of the anti-trust injury cases cited by SMG.  In none of those cases were the market competitor defendants seeking to *drive up costs of the plaintiff's business* through third party arrangements.

In *Leak v. Grant Medical Center*, 893 F. Supp. 757 (S.D. Ohio 1995), *aff'd,* 103 F.3d 129 (6th Cir. 1966), for instance, the defendant hospital's complained

of behavior *only* addressed business activities at its own hospital.  The plaintiff did not allege that he was precluded from competing with the defendant because it was artificially driving up his costs.  If in *Leak,* the hospital had also insisted that a medical supply company would have to kickback one-third of its revenue generated from the plaintiff's medical practice in order for the medical supply company to do business with the hospital, a different result would have occurred.

Similarly, in *Indeck Energy Services, Inc., v. Consumers Energy Company,* 250 F.3d 972 (6th Cir. 2000), the defendant energy company had done nothing to drive up the costs of its competitor, the plaintiff--Indeck.  In fact, it merely offered discounts to its customers to induce them to do business with it exclusively.  If Consumers Energy had forced those who supplied energy to Indeck to give Consumers Energy one-third of all their profits in order to drive up Indeck's costs when it competed with Consumers Energy for the same end customer, the 6th Circuit Court of Appeals would have likely reached a much different result.

The present case is analogous to the situated confronted by the Seventh Circuit Court of Appeals in *Midwest Gas Services, Inc. v. Indiana Gas Co., Inc.,* 317 F.3d 703, 711 (7th Cir. 2003), where it reversed the district court's grant of 12)(b)(6) dismissal and distinguished *Indeck* by finding that a plaintiff adequately pleads an anti-trust injury if it alleges that the defendants are

attempting to "injure" the plaintiff in the marketplace by driving up costs or denying access through specific business practices:

> Here, the plaintiffs allege antitrust claims not only based on the affiliation between the defendants, like Indeck, but also that certain business practices by and between the defendants injure competition.

317 F.3d at 709.

The lessons of *Indeck* and *Midwest Gas Services* as applied here could be summarized this way: if the CAA and Live Nation had entered into a contract where the Van Andel Arena *lowered its* price by one-third of Live Nation's gross profits at Van Andel Arena in order to gain market advantage, no anti-trust injury would lie. However, by attempting to *drive up the costs of Arena Musical Products at the DeltaPlex* in order to reduce competition through fewer non Van Andel concerts, resulting in few West Michigan concerts at higher ticket prices, the CAA has created and Delta has pled a cognizable anti-trust injury—at least one that, as the Second Circuit Court of Appeals found in *Todd,* should not be dismissed on a Rule 12(b)(6) motion.

The Defendants' suggestion that Delta and the other three West Michigan Competitors could avoid that injury by negotiating the same deal is itself, wholly implausible. On its face, Defendants' argument that all four (4) of its major West Michigan Arena Competitors could negotiate similar deals is preposterous, since it would have Live Nation giving away virtually all of its gross profits at any of the competitor arenas in West Michigan. In any event,

this "defense" certainly cannot resolve the case in the Defendants' favor by its very assertion in a Motion, not even a pleading.

**C.     Delta has more than sufficiently pled the willful exercise of monopolistic, anticompetitive power by CAA and SMG regarding the relevant product in the relevant market.**

The FAC alleges that Live Nation controls approximately 90% of the Arena Musical Products in the Market and that CAA holds or controls 75% to 80% of the Arena Musical Products placed in the Market.  [FAC ¶32]. It further alleges that the CAA and SMG have exercised their monopolistic power through the PPA to decrease the number of concerts in the Market [FAC ¶30] and to increase ticket prices through increased costs.  [FAC ¶30].  Thus, the complained of behavior has directly affected both output and prices.

SMG attempts to circumvent these allegations by suggesting that since Live Nation has an admitted  monopoly on arena musical concerts in West Michigan, it would set prices independently of the PPA, and thus there can be no public injury.  (SMG Brief, p. 23).  Ignoring for a moment the market weaknesses in that argument discussed *infra*, this argument is not a Rule 12(b)(6) argument because it is clearly fact, not pleadings, based.  Delta has pled that Live Nation has been affected by decreasing market output and raising ticket prices through the PPA.  [FAC ¶30].  Accusing Delta of not

"supporting" its allegations (SMG Brief, p. 23) is a Rule 56, not a Rule 2(b)(6) argument.

Beyond that fatal flaw, the argument fails to realize what the Second Circuit Court of Appeals again noted in *Todd*; namely, that even monopolists are limited by market restrictions on raising prices. 275 F.3d at 204. The fact that the PPA is precipitating a change in the monopolists' pricing and decreases over all in output (i.e. discouraging the total number of concerts in the Market because they have become cost prohibitive at the Competitor Arenas) states an appropriate and sufficient anti-trust claim. See e.g. 275 F.3d at 204.

Indeed, although as noted above, Delta argues that ticket prices have increased as a result of the PPA, the reality is that contrary to SMG's argument, the allegation of supracompetitive pricing levels is not necessary where the plaintiff alleges that an anticompetitive effect is a reduction in output. In *Todd,* the Second Circuit Court of Appeals, citing *K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Company,* 61 F.3d 123, 129 (2nd Cir. 1995) noted that "if a plaintiff can show an actual adverse effect on competition, such as reduced output...we do not require further showing of market power." 275 F.3d at 206-207.

**D. Delta has also more than sufficiently pled a Section 2 attempted monopolization claim.**

SMG cites *Spectrum Sports v. McQuillan,* 506 U.S. 447, 458 (1993) as outlining the following pleading elements for an attempted monopolization claim: (1) a specific intent to monopolize a relevant market; (2) anticompetitive conduct; and (3) a dangerous probability of success. [SMG Brief, p. 16]. Delta has clearly pled each of these pleading requirements.

Delta has pled that Competitor Arena Revenue Siphoning was the specific idea of SMG and the CAA, not Live Nation [FAC ¶21] and that it is expressly intended to gain for the CAA monopolistic control over the Arena Musical Product in the West Michigan Market [FAC ¶29].

"Anticompetitive or exclusionary conduct under section 2 is "conduct constituting an abnormal response to market opportunities." *Nobody in Particular Presents, Inc. v. Clear Channel Communications, Inc.,*311 F.Supp.2d 1048, 1105 (D. Colo. 2004), quoting with approval, *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc.,* 63 F.3d 1540, 1550 (10th Cir.1995). Delta has pled that Arena Revenue Siphoning is unusual and not expected [FAC ¶19] and is fundamentally unfair given the fact that the Van Andel Arena has natural tax advantages over Delta, to say nothing of the $62 million in state tax dollars that were originally appropriated to the CAA for the Van Andel Arena's construction. [FAC ¶6]. That a public sector would use its authority to operate a convention center to co-promote rock concerts is anything but normal.

Finally, there is not only a likelihood of monopolistic effect for the CAA through the PPA, but Delta has pled that the Competitor Arena Revenue Siphoning has given CAA approximately 80% of the Arena Musical Product in the market. [FAC ¶32]. In *Clear Channel Communications, supra,* the Court noted that any market share over 40% was sufficient to demonstrate that the defendant held the market power sufficient to satisfy an attempted monopolization claim. 311 F.Supp.2d at 1102. The Court held that Clear Channel's 50% of the market share of large arena musical concert was sufficient to present a dangerous probability of success for purposes of a *prima facie* attempted monopolization claim. *Id.* Defendants here clearly exercise in excess of that market control with the PPA.

**4.    Delta has a property interest in the contractual revenues that CAA has siphoned without due process or equal protection, subjecting it to liability under 42 U.S.C. §1983.**

The CAA and SMG mischaracterize the nature of the property right that Delta asserts has been taken by the CAA and SMG through the PPA, misapplies the "post deprivation remedy" case law dealing with procedural due process, and completely ignores Delta's substantive due process claim.

Delta is *not* asserting that its contractual rights with Live Nation have been taken. [CAA Brief, p. 21] Nor, is it claiming that it has a right to be free from competition with the Van Andel Arena because the latter is public. [CAA Brief, p. 21]. As the FAC makes clear, Delta's 42 U.S.C. §1983 claim is that the Competitor Arena Revenue Siphoning is an action under the color of state law

that has diminished the value of the DeltaPlex, and thus constitutes a partial taking without just compensation in violation of the 5th Amendment as applied to instrumentalities of the state under the 14th Amendment. [FAC ¶¶55-67].

There can be no doubt but that diminution in value of a corporation's real property can be the subject of an unconstitutional taking in violation of substantive due process. See *Penn Central Transportation Company v. City of New York,* 438 U.S. 104 (1978). Moreover, a Fifth Amendment "taking" does not require actual physical possession of a person's property, but can be inverse. *Aris Gloves, Inc. v. United States,* 190 Ct.Cl. 367, 420 F.2d 1386, 1391 (Ct.Cl.1970). Takings can occur when government action deprives an owner of the use of his property, *United States v. Causby,* 328 U.S. 256 (1946), interferes with property rights, *R.J. Widen Co. v. United States,* 174 Ct.Cl. 1020, 357 F.2d 988, 993 (Ct.Cl.1966), or makes it possible for someone else to obtain the use or benefit of another person's property. *Eyherabide v. United States,* 170 Ct.Cl. 598, 345 F.2d 565, 570 (Ct.Cl.1965).

Furthermore, the ability of a real property owner to redress takings through 42 U.S.C.A. §1983 is now universally accepted. See *Tomkins v. Village of Tinley Park,* 566 F.Supp. 70, 76 (D.C.Ill.,1983) citing the United States Supreme Court's decision in *Lynch v. Household Finance Corp.,* 405 U.S. 538, 542, *rehearing denied,* 406 U.S. 911 (1972) as having cleared the way for such understanding by ending the "distinction between personal liberties and proprietary rights as a guide to the contours of § 1983." *Id.*

Finally, it is worth noting that takings can be temporary. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning,* 535 U.S. 302 (2002). They can also be partial. See *Appolo Fuels, Inc. v. U.S.,* 381 F.3d 1338, 1344 (Ct. Cl. 2004), citing *Penn Central, supra.*

Delta clearly has a protected property interest in the DeltaPlex. The question Delta presents in this Count is whether the Competitor Arena Revenue Siphoning has partially siphoned for the CAA the value of the DeltaPlex, such that "justice and fairness" require compensation to Delta. The CAA and SMG would have this Court on a Rule 12(b)(6) motion disregard the warning of the Supreme Court in *Penn Central* against any "set formula" for determining what governmental action is or is not a taking, as well as the Supreme Court's instruction that as a general rule, the takings question is one of fact that depends on the particular circumstances:

> "The question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty. While this Court has recognized that the 'Fifth Amendment's guarantee….[is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole, ….this Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remaining disproportionately concentrated on a few persons. …Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends 'upon the particular circumstances [in that] case.'"

438 U.S. at 123 [citations omitted].

The "balancing test" articulated by the Supreme Court in *Penn Central* is uniformly recognized as involving an "ad hoc factual inquiry into three factors: (1) the character of the governmental action, (2) the economic effect of the regulation on the claimant, and (3) the extent to which the regulation interfered with distinct investment-backed expectations." See *K & K Construction, Inc. v. DNR,* 456 Mich 570, 587-588 (1998).

Delta pleads facts which if true suggest that all three factors support a takings finding in its favor. There is no legitimate public purpose served by the Competitor Arena Revenue Siphoning, since Van Andel Arena already has market advantages from its tax exempt status and the millions of dollars of tax dollars or tax deductible donations it received to build the Arena. [FAC ¶62]. Delta has further pled that economic effect of the Competitor Arena Revenue Siphoning has been severe to it, both directly because of the revenues it was not able to negotiate with Live Nation because the latter had to pay its "shake down" fee to the CAA, as well as indirect, in chilling the market from placing Arena Musical Products in the DeltaPlex, thereby greatly diminishing the value of the DeltaPlex. [FAC ¶¶64-65].[5] Finally, Delta purchased and redeveloped the DeltaPlex with the direct expectation and anticipation that it would be able to competitively host Arena Musical Products, which it has not been able to host because of the effect of the PPA. [FAC ¶63]. The PPA, therefore, interferes

---

[5] That there is money directly taken by CAA from Live Nation's activities at DeltaPlex is not the property taken in Delta's analysis. Presumably, Live Nation makes that revenue up through the

with and impairs Delta's legitimate, investment backed expectations. [FAC ¶65].

Furthermore, not only was the negative economic impact of the PPA on Delta and the interference with the Delta's economic expectations anticipated by the CAA and SMG, Delta has pled that this damage and interference with Delta is the intended purpose of the Competitor Arena Revenue Siphoning provisions of the PPA and a reason to keep it secret. [FAC ¶61]. Delta's pleading is more than sufficient to state a substantive due process takings claim, which is sufficient to survive a Rule 12(b)(6) motion. See *Village of Tinley Park, supra.*[6]

The CAA misapplies the *Parrat*[7] doctrine through which federal courts will abstain from hearing a § 1983 claim if the plaintiff has a post-deprivation state law remedy. However, *Parrat* only applies where the lawsuit is against a municipal official for a "random and unauthorized" act. It does not apply, as here, where the municipality itself is sued under § 1983 for damages flowing from a municipal policy or practice:

> "[T]his Court has repeatedly held that *Hudson* and *Parratt* apply only where the deprivation complained of is 'random and unauthorized.' *Alexandre v. Cortes,* 140 F.3d at 411 (quoting *Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990)); *see Sullivan v. Town of Salem,* 805 F.2d 81, 86 (2d Cir.1986). To state it another way, the availability of post-deprivation remedies does not defeat a § 1983 claim where the alleged loss results

---

revenue sharing at Van Andel Arena from non-Live Nation events that Live Nation gets through the PPA.

[6] Delta has pled an equal protection violation, as well, because it has asserted that the CAA's taking does not apply to all other similarly situated arenas in West Michigan. *Id.* [FAC ¶65].

[7] *Parratt v. Taylor,* 451 U.S. 527 (1981)

from adherence to an established state or municipal policy. *See Alexandre,* 140 F.3d at 411; *Sullivan,* 805 F.2d at 86 (*Hudson* and *Parratt* 'are simply inapposite' to suits seeking redress of harms inflicted 'pursuant to town policy')."

*Pangburn v. Culbertson,* 200 F.3d 65, 71 (2nd Cir. 1999).

The CAA does not dispute that it has never held a hearing on the Competitor Arena Revenue Siphoning, has never made any findings of public purpose for the practice [FAC ¶60], has never given Delta or any of the other three arenas to which it applies notice of it [FAC ¶60], does not apply the concept to all arenas [FAC ¶69], and while it profits from the practice, it won't even acknowledge its existence and has apparently destroyed all documentation in its possession regarding it. [FAC ¶60]. This is not only a *prima facie* claim of a violation of procedural due process it may be one of the most egregious procedural due process violations in the annals of federal jurisprudence. It is certainly hard to imagine how a public entity could develop, implement and take advantage of a significant policy with *less* procedural due process than has been effected here.

The CAA also ignores the fact—recognized by other federal courts--that while a takings claim can have procedural due process elements to it, the essence of the claim is a violation of substantive due process, and the existence of a post deprivation remedy is irrelevant to a substantive due process claim:

From plaintiff's complaint, however, it does not appear that she is alleging solely a deprivation of her property without *procedural* due process. Rather, she seems to claim the violation of a *substantive* constitutional guarantee: the right not to have her property seized with

41

the active participation of the government and without just compensation. Recently, in *Wolf-Lillie v. Sonquist,* 699 F.2d 864 (7th Cir.1983), the Seventh Circuit held *Parratt* inapplicable "to instances where the substantive guarantees of the Constitution are alleged to be violated, as opposed to alleged violations of procedural due process. Federal and state courts in effect have concurrent jurisdiction over torts based on substantive constitutional guarantees." *Id.* at 872 (footnote omitted). Under this reading of *Parratt,* plaintiff's claim is cognizable under § 1983 because it alleges a violation of her *substantive* constitutional right not to have her property seized without just compensation.

*Village of Tinley Park, supra,* 566 F. Supp. at 77.

In light of the fact that the CAA has made no findings of any public purpose to the Competitor Arena Revenue Siphoning (taking money for the benefit of public coffers being, of course, present in every takings case and clearly begging the question), it is presently hard to imagine how the CAA will defend the policy or practice under the *Penn Central* balancing test. Suffice it to say, that with all of the allegations in the FAC taken to be true, the diminution in the DeltaPlex's value and appropriation of that value by the CAA through the PPA sufficiently pled a substantive due process takings claim actionable under § 1983.[8]

---

[8] The FAC broadens the 42 U.S.C. §1983 action to include SMG because of its joint exercise of power with the CAA and the fact SMG notes in the PPA that it is acting for the benefit of the CAA. *Village of Tinley Park* described the rationale for holding private actors liable under 42 U.S.C. §1983:

"The Supreme Court has repeatedly recognized that private individuals who willfully participate in joint activity with the state, or its agents, act under color of state law. *Dennis v. Sparks,* 449 U.S. 24, 27-28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1602, 26 L.Ed.2d 142 (1970); *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1156, 16 L.Ed.2d 267 (1966). The degree of joint activity must sufficiently demonstrate 'some nexus between the conduct complained of and

**5. Delta has properly pled state law claims over which the Court should exercise pendent jurisdiction.**

    **A. The District Court properly exercises pendent jurisdiction over state claims that are factually intertwined with federal claims.**

A federal court should assume jurisdiction over a pendent state or local claim where the state and federal claims derive from a common nucleus of operative fact. *United Mine Workers v. Gibb*s, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Delta's state law claims are properly pled and so closely intertwined with its federal law claims that resolution of both species of claims would be judicially efficient and desirable.

---

the state, state official or some state entity.' *Musso v. Suriano,* 586 F.2d 59, 64 (7th Cir.1978). *See also Sparkman v. McFarlin,* 601 F.2d 261 (7th Cir.1979) (en banc).

This required nexus may be demonstrated in any of three ways. First, plaintiff may show that the state affirmatively supported, encouraged or compelled the actionable conduct of the private party. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Musso v. Suriano, supra.* Second, plaintiff may claim that the private individual was performing a function traditionally and exclusively performed by the sovereign. *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978); *Anastasia v. Cosmopolitan National Bank of Chicago,* 527 F.2d 150 (7th Cir.1975). Finally, plaintiff may allege that the private actor, as a result of his conduct, became an instrumentality of state power. *Burton v. Wilmington Park Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Sparkman v. McFarlin, supra* (Sprecher, J., concurring).

The degree of joint activity between the Village and the individual defendants sufficiently establishes a nexus between them for the purposes of surviving a motion to dismiss. The facts pleaded sufficiently allege that the Village "affirmatively supported" the individual defendants' conduct, and this affirmative support was significant "measured either by its contribution to the effectiveness of defendant's conduct, or perhaps by the defiance of conflicting national policy." *Lucas v. Wisconsin Electric Power Co.,* 466 F.2d 638, 656 (7th Cir.1972) (en banc), *cert. denied,* 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1973). Furthermore, the private parties derived "aid, comfort, or incentive" from the affirmative support. *Id.* at 655."

*Village of Tinley Park, supra,* 566 F. Supp. at 74.

It is obvious and conceded by the Defendants that the state antitrust action is intertwined with the federal antitrust claims. Moreover, the issues of whether the CAA has the authority to "regulate" revenues generated within the DeltaPlex and whether the Michigan State Legislature reasonably foresaw the anticompetitive effects of the PPA's Competitor Arena Revenue Siphoning provisions—which control the state action antitrust immunity issue for the CAA—are effectively bound with the state law question of whether the state legislature has authorized the CAA to enter into the PPA.

Likewise, the issue of whether the CAA has exercised its official authority and is actively supervising SMG—which again affects the LGAA immunity question—are woven with the issues of whether the CAA has followed the CFAA, Open Meetings Act and Freedom of Information Act. Finally, whether the CAA and SMG have tortiously interfered with Delta's prospective business advantages is tied to the statutory violations—state and federal, that Delta alleges.

**B.** **CAA would lack the authority to engage in Competitor Arena Revenue Siphoning if it acted in a manner that was procedural compliant with Michigan law. Since the CAA Board has never approved Competitor Arena Revenue Siphoning, CAA's behavior violates the CFAA and Open Meetings Act.**

The CAA's Competitor Arena Revenue Siphoning should be found *ultra vires* for at least two independent reasons. First, as noted above, even if properly pursued, procedurally the CAA has no authority to promote Arena Musical Products in the DeltaPlex. A Michigan municipality has no such

inherent power. It has to rely on statutory grants of authority. See *Crain v. Gibson*, 73 Mich. App. 192 (1972). Defendants know this is true because they rely on the CFAA, which was obviously not a needless act by the legislature, as their authorization. However, as argued *supra,* the power conferred on the CAA in the CFAA is limited to activities that are directly appurtenant to the Van Andel Arena. There is no grant in the CAA to operate activities at the private DeltaPlex. A specific grant of authority would be necessary for such a right.

Second, even if the CFAA granted the CAA the authority to enter into a PPA with Competitor Arena Revenue Siphoning provisions, such authority would have to be exercised by the CAA Board at an open meeting. This is apparent from two provisions of the CFAA that the Defendants fail to cite to the Court in their briefing. The first requires that the CAA Board exercise **all** of the powers and authority of the CAA, while the second requires that the CAA Board conduct **all business at meetings held in compliance with the Open Meetings Act**:

> Sec. 5. The powers, duties, and functions of an authority **are vested in and shall be exercised by a board of directors**.

MCL §141.1405. (Emphasis Added).

> Sec. 7. (1) A board **shall conduct all business at public meetings** held in compliance with the open meetings act, 1976 PA 267, MCL 15.261 to 15.275. Public notice of the time, date, and place of each meeting shall be given in the manner required by the open meetings act, 1976 PA 267, MCL 15.261 to 15.275.

MCL §141.1407(1). (Emphasis Added).

45

Defendants' entire state law case is crammed into MCL §141.1408(1)(c), which provides:

> Sec. 8  (1) An authority may do all things **necessary or convenient to carry out the purposes**, objectives, and provisions of **this act** and the purposes, objectives, and powers delegated to the authority or the board by other laws or executive orders, including, without limitation, all of the following:  ....
>
> > (c) Enter into contracts and other instruments necessary, incidental, or convenient to the performance of its duties and the exercise of its powers and designate the person or persons who have authority to **execute** those contracts and investments on behalf of the authority.

MCL §141.1408(1)(c). (Emphasis Added).

The truth is that the terms "necessity or convenient" in Section 8(1) are linked to the purpose of the CFAA, which is to promote tourism and conventions at the authority's *public* arena, and "authority to execute," merely means the power to *sign* a contract on the CAA's behalf, not the discretion to develop and approve the contract, which is imbedded in Section 5's terms, "powers, duties and functions are vested" in, and "shall be exercised by" the CAA Board.  If Defendants' view of the law were correct, the CAA by entering into one contract with SMG could authorize SMG to conduct all of the CAA's business in private, and SMG, on behalf of the CAA, could contract for any activity that even remotely enhances the operation of Van Andel Arena—such as the purchase and operation of *Charlie's Crab*, a destination restaurant, located two blocks away from the Van Andel Arena.

The CAA's argument that the decision to implement Competitor Arena Revenue Siphoning is not a "public policy" decision begs the question. This is particularly inappropriate on a motion base don the pleadings, since the courts are to construe Open Meetings Act ("OMA") broadly in favor of application. *See Herald Company, Inc. v. Tax Tribunal,* 258 Mich App 78 (2003). Moreover, the position of the CAA that Competitor Arena Revenue Siphoning is not a "public policy" but is an official state act subject to LGAA antitrust immunity is in tension, if not outright conflict with the suggestion the decision to undertake such activity is not a public policy decision.[9] Indeed, any time a public body exercises its authority, the OMA applies. See *Booth Newspapers v. University of Michigan Board of Regents,* 441 Mich 211 (1993). Thus, even if the CFAA did not expressly subject the CAA's decision-making to the OMA, the OMA would apply.

Finally, contrary to CAA's argument, the "impairment of public right" element in an OMA claim only applies if the Court is asked to invalidate the public act taken in violation of OMA. *Wilkins v. Gagliardi,* 219 Mich App 260 (1966). Delta's *ultra vires* and OMA violation claims are adequately pled state law claims.

### C. A public body may not deny access to public records held by its attorney.

---

[9] The inverse result, however, is not necessarily true. In other words, Delta could prove that the OMA applies and prove that the CAA did not undertake or direct "official action" so that it is not entitled to LGAA immunity. Moreover, even if the PPA had been debated and approved by the CAA Board at an Open Meeting, the co-promotion of events at a private arena could be viewed as so blatantly outside of the CAA's authority that no LGAA immunity should be applied.

Delta has pled that the PPA, including past PPAs that were signed by SMG for the CAA [FAC ¶15], and correspondence regarding its negotiation, execution and operations are "public records" subject to production under Michigan's Freedom of Information Act ("FOIA"), MCL §15.231 et seq, even if they are being held by CAA's legal counsel. [FAC ¶100, ¶102; Exhibits C, D, and E to the Complaint]. The definition of "public record" is expansive and to be liberally interpreted, including any record pertaining to public activities unless it is subject to a narrow, specific exception within FOIA. *City of Warren v. City of Detroit*, 261 Mich App 165 (2004). On page 27 of its Brief, the CAA seems to concede that executed versions of the PPA would be public records that would have to be produced. Delta has "great" reason to believe that there are executed versions of the PPA in existence and has so pled their existence in FAC ¶15. Thus, it is difficult to understand how the CAA hopes to evade the FOIA claim on its merits.

Moreover, the CAA's reliance on *Hoffman v. Bay City School District,* 137 Mich App. 333 (1984) will not carry the day. In *Hoffman,* the Michigan Court of Appeals merely held that the FOIA could not be used to obtain an attorney's investigatory work product. However, other courts have noted their belief that the Michigan courts would not tolerate an expansion of *Hoffman* to include nonprivileged executed correspondence or contracts that relate to the public

body's business that are held in counsel's possession—which is exactly what

Delta is claiming here:

> Foster obtained copies of certain tenant subleases from BSM at the request of the former Director of the Division of HCD. At the same time he was requested to run an analysis on these leases to ascertain how well the City was faring. It should be noted that Foster acted as legal counsel for the City when the standard form leases were initially developed. There is no dispute that Foster received and kept these documents in the course and scope of his duties as attorney for the Division of HCD. The fact that he works in a private law office and retains the documents in private premises, as contended by the City, is immaterial. Under our case law, an attorney is his client's agent. *Winstead v. First Tennessee Bank N.A., Memphis,* 709 S.W.2d 627 (Tenn.App.1986). Again, we are of the opinion that *Board of Education v. Memphis Publishing Co., supra,* is the authority for holding that these documents were public records held by one in a public capacity.
>
> We are also of the opinion that City's reliance upon the cases of *Hoffman v. Bay City School District,* and *Forsham v. Harris,* 445 U.S. 169, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980) is misplaced. We say this for two reasons: First, the *Hoffman* court looked to *Forsham* because it could find no established precedent in the state of Michigan to which it could refer. As we have already noted, there is more than ample precedent in this state. Second, and of even more importance, is the fact that in *Hoffman* the plaintiff was trying to gain access through the Michigan Freedom of Information Act to the investigatory file, including a final report of an investigation undertaken by the attorney employed for that purpose by the public school board. The case under consideration would be similar to *Hoffman* if Foster had completed his analysis of the subtenant leases but had not submitted it to the City, and MPC thereafter sought access to Foster's report. The file sought to be inspected in *Hoffman* in essence was the work product of the attorney employed by the school board, not what was deemed to be public documents placed in his possession.

*Creative Restaurants, Inc. v. City of Memphis,* 795 S.W.2d 672, 679 (Tenn.App.,1990].

Delta is confident that this Court will conclude, as did the Court in

*Creative Restaurants, Inc.,* that a public body may not avoid FOIA requests for

records pertaining to a contracts resulting in hundreds of thousands of dollars in public revenue, merely because its legal counsel or agent, SMG, are holding those public records. At this point, anyway, this Court has to conclude that Delta has pled a colorable FOIA claim.

**D.      Delta has pled a colorable interference with business expectancy claim.**

Defendants concede that there is a Michigan tort of interference with prospective  business expectance and that in its Complaint Delta has asserted the proper four proper elements; namely (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) an intentional interference [through improper conduct] causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy has been disrupted. *Northern Plumbing & Heating, Inc. v Henderson Brothers, Inc.*, 83 Mich. App. 84, 93, 268 N.W.2d 296 (1978), lv. den. 405 Mich. 845 (1979).

Defendants do not deny that Delta has had a business relationship with Live Nation and expected to that relationship to continue [FAC ¶78], and that Defendants knew about that relationship (FAC ¶79], but attack Delta for not alleging that the PPA has led to the termination of diminution of the business expectancy. Paragraph 45 of the FAC, which is incorporated by reference into Count V, expressly alleges that Live Nation has not sent concerts that it would have sent to Delta because of the Competitor Arena Revenue Siphoning and,

indeed, has advised Delta that it will not be sending more concerts to the DeltaPlex. Accordingly, Delta has more than met its burden.

Defendants' further asserted, although yet to be pled affirmative defense; namely, that Delta's injuries are a mere incident of its competition with the CAA is specious, at least as a defense on a Rule 12(b)(6) motion, given the allegations of impropriety in the Competitor Arena Revenue Siphoning, as pled through-out the FAC. [See summarization of allegations of impropriety contained in FAC ¶81; see also antitrust allegations--FAC ¶¶40-48; 19893 action-- FAC ¶¶55-71; *ultra vires* allegations—FAC ¶¶74-75; OMA violations-- FAC ¶¶85-93 and FOIA violations-- FAC ¶¶95-103].

## Conclusion

For the reasons set forth in this Response, Delta respectfully requests that this Court deny the Defendants' Motions under Fed.R.Civ.P. 12(b)(6) in their entirety.

**SILVER & VAN ESSEN, P.C.**
Attorneys for Plaintiff Delta Turner


/s/ Douglas W. Van Essen
Dated: November 10, 2008           By:_____
                                   Douglas W. Van Essen (P33169)
                                   Lee T. Silver (P36905)

**BUSINESS ADDRESS & TELEPHONE**
116 Ottawa Avenue N.W.
Grand Rapids, MI 49503
(616) 988-5600
dwv@silvervanessen.com

51