## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

DELTA TURNER, LTD, a Michigan
corporation,

                              Plaintiff,

            vs.                                    **CASE NO. 1:08-cv-544**

GRAND RAPIDS-KENT COUNTY                           **ORAL ARGUMENT REQUESTED**
CONVENTION/ARENA AUTHORITY, a
Michigan Municipal Authority, and SMG, a
Pennsylvania General Partnership,

                              Defendants.

## DEFENDANTS' JOINT REPLY IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT ......................................................................................................... 3

I.  DELTA CANNOT OVERCOME DEFENDANTS' IMMUNITY ....................... 3

    A.  Delta Fails To Overcome Defendants' *Parker* Immunity ........................ 3

        1.  The "Clear Articulation" Prong Does Not Require An Explicit
           Grant Of Authority For The PPA ............................................... 3

        2.  Delta's Ultra Vires Argument Is Irrelevant ................................. 6

        3.  Delta Ignores The "Effective Decision Maker" Test ................... 7

    B.  The LGAA Is Broader Than Delta Claims And Clearly Covers the PPA ............. 8

II.  DELTA DOES NOT REFUTE DEFENDANTS' SHOWING THAT IT FAILS
    TO PLEAD A SHERMAN ACT VIOLATION .................................................. 9

    A.  Delta Misstates The Standard And Ignores *Twombly* ............................ 9

    B.  Delta Fails To Show That It Has Sufficiently Pled An Interchangeable
        Product Market ................................................................................ 10

    C.  Delta Fails To Show That It Has Pled Market Power ............................ 12

    D.  Delta Fails To Show That It Has Pled Anticompetitive Effects And
        Antitrust Injury ............................................................................... 14

III.  DELTA DOES NOT ADEQUATELY PLEAD A § 1983 CLAIM ................... 18

    A.  Delta Does Not Allege The Deprivation Of A Property Right ............... 18

    B.  Delta Concedes SMG's Qualified Immunity From Liability Under § 1983 ......... 20

IV.  DELTA FAILS TO SUSTAIN ITS STATE LAW CLAIMS ........................... 20

CONCLUSION ..................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

*Arctic King Fisheries, Inc. v. United States,*
　　59 Fed. Cl. 360 (Fed. Cl. 2004) ...........................................................................19

*Astoria Entertainment, Inc. v. Edwards,*
　　159 F. Supp. 2d 303 (E.D. La. 2001) ......................................................................7

*Atlantic Richfield Co. v. USA Petroleum Co.,*
　　495 U.S. 328 (1990)...............................................................................................17

*Bansavich v. McLane Co.,*
　　No. 3:07cv702, 2008 U.S. Dist. LEXIS 89071 (D. Conn. Oct. 31, 2008).............10

*Barry Wright Corp. v. ITT Grinnell Corp.,*
　　724 F.2d 227 (1st Cir. 1983) ..................................................................................15

*Basset v. NCAA,*
　　528 F.3d 426 (6th Cir. 2008) ..................................................................................10

*Bell Atlantic Corp. v. Twombly,*
　　127 S. Ct. 1955 (2007)..............................................................................1, 9, 11, 15

*Campfield v. State Farm Mutual Automobile Insurance Co.,*
　　532 F.3d 1111 (10th Cir. 2008) ..............................................................................10

*Chapman v. New York State Division for Youth,*
　　No. 05-7010, 2008 U.S. App. LEXIS 21495 (2d Cir. Oct. 14, 2008) ..............10, 11

*Cienega Gardens v. United States,*
　　503 F.3d 1266 (Fed. Cir. 2007)...............................................................................18

*City of Columbia v. Omni Outdoor Advertising, Inc.,*
　　499 U.S. 365 (1991)......................................................................................4, 6, 20

*Community Communications Co. v. City of Boulder,*
　　455 U.S. 40 (1982).....................................................................................................4

*Conley v. Gibson,*
　　355 U.S. 41 (1957).....................................................................................................9

*Consolidated Television Cable Service, Inc. v. City of Frankfort,*
　　857 F.2d 354 (6th Cir. 1988) ..................................................................................4, 6

*Cullinan v. Abramson*,
128 F.3d 301 (6th Cir. 1997) ................................................................20

*Cupp v. Alberto-Culver USA, Inc.*,
310 F. Supp. 2d 963 (W.D. Tenn. 2004)................................................10

*Discon, Inc. v. NYNEX Corp.*,
93 F.3d 1055 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998)......................11

*Electrical Inspectors, Inc. v. Village of East Hills*,
320 F.3d 110 (2d Cir. 2003)....................................................................3

*Expert Masonry, Inc. v. Boone County*,
440 F.3d 336 (6th Cir. 2006) ...........................................................15, 16

*Gemini Concerts, Inc. v. Triple-A Baseball Club Associates*,
664 F. Supp. 24 (D. Me. 1987) .............................................................17

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982).............................................................................20

*Hybud Equipment Corp. v. City of Akron*,
654 F.2d 1187 (1981), *vacated on other grounds*, 455 U.S. 931 (1982)................................19

*Indeck Energy Services v. Consumers Energy Co.*,
250 F.3d 972 (6th Cir. 2000) ................................................................16

*Leak v. Grant Medical Center*,
893 F. Supp. 757 (S.D. Ohio 1995), *aff'd*, 103 F.3d 129 (6th Cir. 1996) ................................16

*Little Caesar Enterprises, Inc. v. Smith*,
34 F. Supp. 2d 459 (E.D. Mich. 1998)....................................................12

*Michigan Paytel Joint Venture v. City of Detroit*,
287 F.3d 527 (6th Cir. 2002) ..............................................................3, 7

*Midwest Gas Services, Inc. v. Indian Gas Co.*,
317 F.3d 703 (7th Cir. 2003) ................................................................16

*National Child Support, Inc. v. Hayes*,
No. 1:02-cv-928, 2005 U.S. Dist. LEXIS 9355 (S.D. Ohio Apr. 18, 2005).............................6

*NicSand, Inc. v. 3M Co.*,
507 F.3d 442 (6th Cir. 2007) ..........................................................10, 16

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ...................................................................14

*Opdyke Investment Co. v. City of Detroit*,
  883 F.2d 1265 (6th Cir. 1989) ....................................................................9

*Padgett v. Louisville & Jefferson County Air Board*,
  492 F.2d 1258 (6th Cir. 1974) ....................................................................4

*Penn Central Transport Co. v. New York City*,
  438 U.S. 104 (1978)............................................................................18, 19

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)..................................................................10, 12

*Richardson v. McKnight*,
  521 U.S. 399 (1997)...................................................................................20

*Rick-Mik Enterprises, Inc. v. Equilon Enterprises, LLC*,
  532 F.3d 963 (9th Cir. 2008) ......................................................................9

*Ryko Manufacturing Co. v. Eden Services*,
  823 F.2d 1215 (8th Cir. 1987) ...................................................................14

*Schor v. Abbott Laboratories*,
  457 F.3d 608 (7th Cir. 2006) .....................................................................13

*Spahr v. Leegin Creative Leather Products*,
  No. 2:07-CV-187, 2008 U.S. Dist. LEXIS 90079 (E.D. Tenn. Aug. 20, 2008) ....................10

*Tal v. Hogan*,
  453 F.3d 1244 (10th Cir. 2006) ...................................................................7

*Tampa Electric Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961)...................................................................................14

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)...............................................................11, 12, 16

*Total Benefits Planning Agency Inc. v. Anthem Blue Cross and Blue Shield*,
  No. 1:05cv519, 2007 U.S. Dist. LEXIS 53862 (S.D. Ohio July 25, 2007) ......................15

*Town of Hallie v. City of Eau Claire*,
  471 U.S. 34 (1985)..................................................................................4, 5

*Tri-State Rubbish, Inc. v. Waste Management, Inc.*,
   998 F.2d 1073 (1st Cir. 1993) ................................................................................19

*Trigen-Oklahoma City Energy Corp. v. Oklahoma Gas & Electric Co.*,
   244 F.3d 1220 (10th Cir. 2001) ...............................................................................7

*U.S. Steel Corp. v. Fortner Enterprises, Inc.*,
   429 U.S. 610 (1977) ...............................................................................................17

*Virgin Atlantic Airways v. British Airways*,
   257 F.3d 256 (2d Cir. 2001) ...................................................................................17

*Wheeler v. Beard*,
   No. 03-4826, 2005 U.S. Dist. LEXIS 9778 (E.D. Pa. May 19, 2005) ......................7

## STATUTES AND RULES

15 U.S.C. § 36(a) ...................................................................................................4, 8

42 U.S.C. § 1983 .......................................................................................................20

Mich. Comp. Laws § 141.1402 ..................................................................................5

Mich. Comp. Laws § 141.1408(1) ...........................................................................1, 6

Mich. Comp. Laws § 141.1408(1)(c) ..........................................................................6

Fed. R. Civ. P. 12(b)(6) ............................................................................................20

## OTHER AUTHORITY

3-49 *Antitrust Laws and Trade Regulation* § 49.04 (2d ed. 2008) ................................8

4-56 *Antieau on Local Government Law* § 56.05 (2d ed. 2008) ...................................8

1A Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 222a (2d ed. 2000) ..........8

9 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 1706a, 1706b (2d ed. 2000).............13

Frank H. Easterbrook, *The Limits of Antitrust,* 63 Tex. L. Rev. 1 (1984) ....................18

## PRELIMINARY STATEMENT

In their opening memoranda, defendants demonstrated that they have antitrust immunity under the state action doctrine and the Local Government Antitrust Act ("LGAA") and that, in any event, Delta fails to plead its Sherman Act claims under Sixth Circuit law and *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).  Defendants also demonstrated that Delta's Section 1983 claim and its state law claims (in Counts II, IV, V, VI, and VII) are likewise fatally flawed and, at a minimum, that the state law claims are better left to a state tribunal to adjudicate.  For these reasons, the First Amended Complaint ("FAC") should be dismissed with prejudice.

In its opposition brief, Delta does not overcome the legally dispositive immunity.  Rather, Delta ignores controlling case law from the Sixth Circuit and more recent Supreme Court authority in favor of outdated and inapposite authority from the Second Circuit and a twenty-five year old pre-LGAA decision by the Court.  Delta's head-in-the-sand opposition thus completely fails to overcome defendants' showing that:

- The alleged PPA was formed pursuant to a clearly articulated state policy embodied in the CFAA.  Among other things, the CFAA authorizes CAA to "do all things necessary or convenient" including "[e]nter[ing] into contracts" to further the goals of "promoting tourism and convention business in order to assist in … the alleviation of the conditions of unemployment," Mich. Comp. Laws § 141.1408(1);

- The PPA is both a logical and foreseeable outcome of the CFAA.  It provides to CAA, consistent with the CFAA's goals, a *guaranteed* $1.4 million benefit and incentivizes Live Nation to book entertainment events to the Van Andel Arena, (FAC, Ex. B at 3); and

- CAA was, according to Delta's own allegations, the "effective decision maker" on the PPA:

  − Delta claims that CAA "conspired" with SMG to form the PPA, which the FAC concedes results in a $1.4 million guaranteed benefit to CAA;

  − The signature line on the PPA is for Rich MacKeigan, SMG's general manager, who also serves as CAA's Executive Director, (*id.*, Ex. B at 5); and

  − Throughout the FAC, Delta alleges that SMG acted as CAA's agent and under its control (*id.* ¶¶ 13, 20, 24, 34, 38).

Likewise, Delta's opposition cannot overcome the factual admissions in the FAC (and its attachments) showing that Delta's purported antitrust claims are implausible and do not contain

1

the factual allegations—as opposed to conclusions—necessary to state a claim.  Indeed, Delta's

opposition leaves completely undisturbed defendants' showing that:

- Delta's proposed product market—"Arena Musical Products"—confuses the business of renting space to events (which is what Van Andel and Delta are alleged to do) and the business of selling tickets (which is what Live Nation is alleged to do).  This product market is also contradicted by Delta's own allegations in the FAC and by the terms of the PPA, which concede that venues such as Delta and Van Andel host both musical events generally as well as other types of events (including sporting and other entertainment events) (FAC ¶¶ 1, 2);

- If anyone has market power, it is Live Nation (which purchases arena space) and not CAA/SMG (which sell arena space in competition with Delta).  Delta in fact concedes that "Live Nation *controls* approximately 90% of the Arena Musical Products in the market and that CAA holds or controls 75% to 80% of the Arena Musical Products *placed* in the market") (Plaintiff's Consolidated Brief in Opposition to the Motions to Dismiss Of Defendants SMG and CAA ("Opp.") at 34 (emphasis added); FAC ¶ 32); and

- The PPA is not actionable anticompetitive conduct, and does not give rise to antitrust injury.  The PPA is a non-exclusive agreement.  While the PPA offers CAA the opportunity to share in the profits of certain events not held at Van Andel, it also requires it to share in the losses, subject to the guaranteed minimum.  All four venues located near Van Andel, including Delta, are free under the PPA to compete for Live Nation events and even to enter into a similar agreement.[1]  In short, the incentives contained in the PPA for Live Nation and CAA to work together do not, as a matter of law, amount to a harm to *competition*, and the rental revenues that Delta alleges it has lost as a result are not antitrust injury.

Finally, Delta does not provide any basis to sustain its remaining claims, which are also

legally insufficient.  The remaining claims are largely purported state law-based challenges to the

conduct of CAA, a Michigan municipal authority.  To the extent that Delta has the right to a

declaration that the municipal CAA authority acted "beyond its authority" (Count IV) or a claim

that the municipal CAA violated Michigan's Open Meetings Act (Count VI) or Michigan's

FOIA (Count VII), those matters are quintessentially best left to the state courts.  Furthermore,

the law is clear that Delta cannot transform such state law claims into federal ones by arguing

that the allegedly wrongful nature of defendants' actions strips them of immunity.  A contrary

---

[1] Indeed, the DeltaPlex hosted a concert promoted by Live Nation as recently as November 18, 2008.  *See* Live Nation, Avenged Sevenfold & Buckcherry Concert Tickets, *available at* http://www.livenation.com/edp/eventId/337582 (last viewed on Nov. 25, 2008).

rule would render immunity illusory and result in federal courts usurping the jurisdiction of the state courts.  For those reasons and others detailed below and in defendants' opening briefs, the FAC must be dismissed with prejudice.

## ARGUMENT

## I.    DELTA CANNOT OVERCOME DEFENDANTS' IMMUNITY

Delta does not and cannot dispute that, under controlling authority, defendants are immune.  Delta thus relies on misrepresentations of Supreme Court and Sixth Circuit law, as well as a web of contradictory allegations to argue that the state action doctrine and the LGAA do not immunize defendants.  These arguments fail to refute defendants' showing of immunity.

### A.    Delta Fails To Overcome Defendants' *Parker* Immunity

#### 1.    The "Clear Articulation" Prong Does Not Require An Explicit Grant Of Authority For The PPA

Delta claims that CAA and SMG did not enter into the alleged PPA pursuant to a "clearly articulated state policy" because the CFAA does not *explicitly* provide "authority to suppress competition."  (Opp. at 11, 14.)  As its decision to rely upon Second Circuit precedent makes clear, Delta is overreaching.  *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527 (6th Cir. 2002), controls.  In that case the Sixth Circuit held that "a clearly articulated state policy" that "authorize[s] anticompetitive conduct," requires only that "the suppression of competition *is the foreseeable or logical result* of what the state authorizes."  *Id*. at 535-36 (emphasis added).[2] The Supreme Court and the Sixth Circuit have routinely found immunity where a state statute authorizes a municipality to enter into contracts that foreseeably could lead to anticompetitive

---

[2] At all events, *Electrical Inspectors, Inc. v. Village of East Hills*, 320 F.3d 110 (2d Cir. 2003), is not to the contrary.  This Second Circuit decision stated that the Supreme Court has "made clear that the first [clear articulation] prong … is not as demanding  …. It does not, for example, require a private party to show a specific, detailed legislative authorization for its challenged conduct."  *Id.* at 124 (quotations omitted).

conduct, but makes no reference to an impact on competition or to the specific content of the contracts.[3]

Delta mischaracterizes the history of the immunities that apply here, claiming that *Michigan Paytel* cannot be squared with *Community Communications Co. v. City of Boulder*, 455 U.S. 40 (1982), and the LGAA.  (Opp. at 14-16.)  Delta suggests that the LGAA somehow codified limits on the state action doctrine in response to *City of Boulder*.  Delta is wrong.  In *City of Boulder*, the Court held that a broad grant of "home rule" powers to a municipality to manage its affairs did not have the foreseeable result of "an 'emergency' ordinance prohibiting [a cable television business] from expanding its business."  455 U.S. at 45-46.  Congress responded to *City of Boulder* by enacting the LGAA in 1984.  Through the LGAA, Congress sought to remove limits that the Court in *City of Boulder* placed on municipal immunity, fearing that the threat of monetary damages would limit the ability of municipalities to govern.  The LGAA thus creates immunity from damages, fees, and costs when an antitrust claim is "based on any official action directed by a local government, or official or employee thereof acting in an official capacity."  15 U.S.C. § 36(a).  But that is not the end of the story.

In *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985), the Supreme Court provided further guidance on the scope of municipal immunity available under the state action doctrine.  The Court rejected the same argument advanced by Delta here (Opp. at 18) that, under *City of Boulder*, if a state did not expressly mention specific anticompetitive conduct, there was no evidence that the state intended to displace competition.  The Court held that any limitations that *City of Boulder* placed on local government immunity were limited to "home rule" situations

---

[3] *See, e.g.*, *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 372-73 (1991) (finding such a foreseeable result where statute did not expressly authorize anticompetitive conduct, because "[t]he very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition"); *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985) (monopolization of sewage collection was "a foreseeable result" of granting broad sewage management authority); *Consol. Television Cable Serv., Inc. v. City of Frankfort*, 857 F.2d 354, 360 (6th Cir. 1988) (monopolization of cable television services was a foreseeable result of broad utility franchising authority); *Padgett v. Louisville & Jefferson County Air Bd.*, 492 F.2d 1258, 1260 (6th Cir. 1974) (affirming dismissal of antitrust claims because grant of power to operate airport included contracting for taxis).

where the defendant could identify only an expansive grant of authority to manage a municipality's affairs in extremely general terms.   471 U.S. at 43 ("Th[e] Amendment to the Colorado Constitution allocated only the most general authority to municipalities to govern local affairs.").   The Court held that, because the monopolization of sewage collection was "a foreseeable result" of granting broad sewage management authority, "it is clear that anticompetitive effects logically would result from this broad authority to regulate." *Id.* at 42. Contrary to Delta's argument, the Court never suggested that the state action immunity that it recognized was restricted by the immunity grant that Congress supplied through the LGAA.

This history demonstrates why Delta's claim that *City of Boulder* should guide the analysis here must fail.  Unlike the statute in *City of Boulder*, the CFAA is neither "neutral" nor "silent," as Delta claims.  (Opp. at 16.)  Instead, like the statute in *Hallie* (which broadly authorized municipalities to manage sewage collection and transportation), the CFAA broadly authorizes CAA to operate an arena, and directs it to take any reasonable steps necessary or convenient to achieve its goal of "promot[ing] tourism and convention business in order to assist in the prevention of unemployment and the alleviation of the conditions of unemployment, to preserve existing jobs, and to create new jobs to meet the employment demands of population growth."  Mich. Comp. Laws § 141.1402.  Of course, arenas need to rent their space to event promoters, and CAA has a legitimate and foreseeable interest in maximizing its rental revenues and ensuring a flow of events to the Van Andel Arena.  By definition, any event that Van Andel hosts will not be hosted at other arenas.  Moreover, Delta admits that Van Andel's very existence as a tax-advantaged, publicly-owned arena places Delta at a competitive disadvantage in attracting events.  (FAC ¶¶ 6-7; Opp. at 1, 5.)  It thus was clearly foreseeable that the activities of CAA would result in exactly what Delta complains about here—less rental revenue.  (SMG's Motion to Dismiss ("SMG Br.") at 8.)[4]

---

[4] By contrast, Delta's opposition takes an absurdly limited view of what the CFAA authorizes. For example, Delta suggests the CFAA does not authorize musical concerts, which "serve local residents," because the CFAA is to "promote *conventions and tourism*."  (Opp. at 12 (emphasis

Delta also argues that the authority the CFAA confers is not so broad, citing the CFAA's definitions section to argue that CAA's authority "is limited to arena activities that are physically connected or appurtenant to the Van Andel Arena." (Opp. at 12-13.) This argument fails for two reasons. First, it misreads the CFAA, which authorizes CAA to "*do all things necessary or convenient* to carry out the purposes, objectives, and provisions of [the CFAA]," Mich. Comp. Laws § 141.1408(1) (emphasis added), including "[e]nter[ing] into contracts and other instruments necessary, incidental, or convenient to the performance of its duties and the exercise of its powers ..." *Id.* § 141.1408(1)(c). These provisions do not support the "geographical" limitation that Delta proposes. Second, even if Delta's interpretation were correct, it would be irrelevant because the PPA does not provide for CAA operation of Delta. Rather, the PPA aligns the interests of CAA and Live Nation in the success of events in Grand Rapids by giving CAA a guaranteed minimum rent, and—subject to the guaranteed minimum—allowing the parties to share in the upside and downside of events across the Grand Rapids area, including events at Van Andel not promoted by Live Nation.

### 2. Delta's Ultra Vires Argument Is Irrelevant

Delta also argues that, even if the CFAA authorized CAA's and SMG's conduct, the claim that defendants "violated the law" or "engaged in ... wrongful conduct" impacts the immunity analysis. (Opp. at 3-4, 20-23.) Specifically, Delta complains that CAA failed to comply with the Michigan Open Meetings Act when it entered into the PPA. (*Id.* at 20-21.) However, the Supreme Court and the Sixth Circuit have squarely held that allegations of ultra vires and illegal conduct are *irrelevant* to the immunity analysis.[5] Courts have applied this

---

original).) Similarly, Delta argues that CAA's contracting authority under the CFAA is limited to the act of "signing" a contract, but nothing else. (*Id.* at 13.)

[5] *See, e.g., Omni Outdoor,* 499 U.S. at 371-72 (rejecting the argument that defendants were not entitled to immunity because they did not follow the law and noting that requiring defendants to show that their conduct was within their delegated authority "would have unacceptable consequences" because it would force federal courts to opine on legal questions that should be left to the states); *Consol. Television,* 857 F.2d at 361-62 (6th Cir. 1988) (same; "whether the state authorizes" the conduct "precisely as ... defendants contemplate[] is better left to the determination of state courts"); *Nat'l Child Support, Inc. v. Hayes,* No. 1:02-cv-928, 2005 U.S. Dist. LEXIS 9355, at *23-24 (S.D. Ohio Apr. 18, 2005) ("[S]tate actors do not lose their

doctrine to find immunity in cases involving truly egregious conduct, including bribery, fraud, extortion and other corruption.[6]  Delta's allegations of the PPA's "unlawfulness" based upon an alleged technical violation of the Open Meetings Act thus are not relevant to whether defendants are immune.

### 3.    Delta Ignores The "Effective Decision Maker" Test

To satisfy the "active state supervision" prong of the state action immunity test (which applies only to SMG), Delta argues that SMG must show "that it was actively supervised by the state of Michigan" itself.  (Opp. at 17-18.)  Delta again misstates the law.  In *Michigan Paytel*, the Sixth Circuit addressed whether *the state* or *the municipality* need be the effective decision-maker to confer immunity on a private actor.  The court held that "[i]f the municipality or a municipal agent was the effective decision maker, then the private actor is entitled to state action immunity, *regardless of state supervision*."  287 F.3d at 538 (emphasis added).  To conclude that the municipality was not the "effective decision maker," a court must find that the private entity made "independent decisions without the input, advice, involvement, or oversight of … any other governmental body."  *Id.* (quotations omitted).

Delta has pled away any possibility of arguing that SMG entered into the alleged PPA as a result of "independent decisions without the input, advice, involvement, or oversight" of CAA.  Delta admits that the injury it claims in this case "flow[s] from a municipal policy or practice" of CAA.  (Opp. at 41.)  Delta also repeatedly contends in the FAC that CAA called the shots.

---

antitrust immunity because they make a 'wrong' decision, or misapply the law in reaching a particular decision.").

[6] *See, e.g., Trigen-Oklahoma City Energy Corp. v. Okla. Gas & Elec. Co.*, 244 F.3d 1220, 1227 (10th Cir. 2001) (directing the dismissal of energy company's Sherman Act claims based on state action immunity despite allegations of "improper payments, undue influence, and lavish entertainment to gain business" because "even if [defendant] had committed these alleged 'bad acts,' its state action immunity would remain intact"); *Tal v. Hogan*, 453 F.3d 1244, 1259 (10th Cir. 2006) (affirming dismissal based on state action immunity in case involving allegations of bribery and fraud); *Wheeler v. Beard*, No. 03-4826, 2005 U.S. Dist. LEXIS 9778, at *17-18 (E.D. Pa. May 19, 2005) (finding state action immunity where private vendors paid kickbacks to government entity for awarding exclusive contracts); *Astoria Entm't, Inc. v. Edwards*, 159 F. Supp. 2d 303, 310-11, 322-24 (E.D. La. 2001) (dismissing antitrust claim based on state action immunity where plaintiff alleged extortion, corruption and bribery of public officials).

(SMG Br. at 9-10 (collecting FAC cites that characterize SMG as CAA's agent).) Indeed, Delta pleads that "CAA and SMG have … conspired through the PPA" to violate the Sherman Act. (FAC ¶ 44.) Similarly, Delta completely ignores the fact that the PPA's signature line is for Rich MacKeigan, who is *both* SMG's general manager for the Van Andel Arena *and* CAA's Executive Director. (*See* FAC, Ex. B at 5; SMG Br. at 10-11, Ex. A to Decl. of Jason D. Cruise.) Finally, Delta's own FAC demonstrates that the PPA provides a $1.4 million guaranteed minimum revenue to CAA (FAC, Ex. B at 3)—a benefit in CAA's interests and consistent with the CFAA. Delta's own allegations, admissions, and submissions thus obviate as a matter of law any argument that CAA was not the "effective decision maker" regarding the PPA.

### B. The LGAA Is Broader Than Delta Claims And Clearly Covers the PPA

Delta argues that defendants cannot obtain immunity under the LGAA because "Competitor Arena Revenue Siphoning is not remotely, much less reasonably included within the CAA's CFAA authority." (Opp. at 20.) The LGAA, however, provides much broader protection for municipalities and their private agents than Delta claims. To qualify for its protections, there must be "official action directed by a local government, or official or employee thereof acting in an official capacity." 15 U.S.C. § 36(a). "[B]y failing to define either ['official action' or 'official capacity'] and by extending the exemption from damage actions to persons other than local governments and their employees, Congress intended to have the scope of 'official action' or 'official capacity' read as broadly as possible." 3-49 *Antitrust Laws and Trade Regulation* § 49.04 (2d ed. 2008). The LGAA's "legislative history … expresses a Congressional intent to dispense with the 'clear articulation' test …" 4-56 *Antieau on Local Government Law* § 56.05 (2d ed. 2008). Professor Areeda's seminal treatise confirms that the LGAA "provides that even in the case of non-immune regulation, local governments cannot be held accountable for damages or attorney's fees" and "provides a similar limitation … for private parties acting under a non-immune local government provision." 1A Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 222a (2d ed. 2000). Indeed, the Sixth Circuit held in *Opdyke*

8

*Investment Co. v. City of Detroit*, 883 F.2d 1265, 1271 (6th Cir. 1989), that the LGAA immunized a hockey team owner's actions taken under a statute much broader than the CFAA (the Michigan Home Rule City Act) that merely provided authority in very general terms.  (SMG Br. at 13-14.)  Delta's claim that the CFAA does not "specifically" authorize the PPA fails as a matter of law under the LGAA.[7]

## II.   DELTA DOES NOT REFUTE DEFENDANTS' SHOWING THAT IT FAILS TO PLEAD A SHERMAN ACT VIOLATION

### A.   Delta Misstates The Standard And Ignores *Twombly*

Relying on cases that preceded the Supreme Court's landmark decision in *Twombly*, Delta argues that the Court "cannot dismiss plaintiffs' complaint unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief.'" (Opp. at 7 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).)  That is not the law. *Twombly*, in no uncertain terms, "*retired*" *Conley*:  "Conley's 'no set of facts' language has been questioned, criticized and explained away long enough. … [T]his famous observation has earned its retirement."  *Twombly*, 127 S. Ct. at 1969.  "In *Twombly*, at least in antitrust matters, the Supreme Court 'retired' the  familiar  language derived from *Conley* …"  *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 970-71 (9th Cir. 2008).

Under *Twombly*, an antitrust plaintiff cannot rest on allegations of conduct that are conclusory or competitively "neutral"—i.e., as consistent with an illegal agreement as with competition.  127 S. Ct. at 1972.  Instead, the Court must find that, "when viewed in light of common economic experience," a plaintiff's allegations create a "plausible suggestion" of anticompetitive conduct.  *Id.* at 1971.  In short, because a plaintiff that *proves* competitively neutral conduct does *not prove* an antitrust violation, a plaintiff that *pleads* competitively neutral conduct does *not plead* an antitrust violation.[8]

---

[7]  Delta also repeats its contention that CAA did not "actively supervise" SMG.  (Opp. at 21-23.) As explained *supra* 7-8, Delta's own allegations and arguments foreclose this claim.

[8]  *See* Appendix A (collecting cases dismissing antitrust claims for failure to plead an antitrust violation under the standard set forth in *Twombly*).

Delta cannot prevail under this standard, so it instead claims that defendants improperly argue for a "heightened pleading standard" and that defendants ask plaintiffs to satisfy Rule 56's summary judgment standard in lieu of Rule 8.  (Opp. at 24, 34.)  Defendants do neither and instead assert only that this Court should hold Delta to its burden under *Twombly* and Rule 8 to plead a plausible claim and facts—not labels or conclusions—that support each element of that claim.  *See NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 451 (6th Cir. 2007) (en banc) (under *Twombly*, "an antitrust claimant must put forth factual 'allegations plausibly suggesting (not merely consistent with)' antitrust injury"); *Basset v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (affirming dismissal of antitrust claims under *Twombly* where plaintiff did not allege harm to a relevant market).  As detailed in defendants' opening briefs and below, Delta falls far short of its burden:  Delta does not allege a single fact that, if proven, would allow this Court to find that (1) Delta has pled a relevant product market, (2) defendants have market or monopoly power in that product market, or (3) defendants' conduct had anticompetitive effects.

## B.    Delta Fails To Show That It Has Sufficiently Pled An Interchangeable Product Market

Delta does not respond to defendants' showing that, as a matter of law, Delta's failure to reference the rule of reasonable interchangeability in its Amended Complaint compels dismissal. (SMG Br. at 17 & n.9.)  And Delta fails to address the point that, even if it had pled reasonable interchangeability, that allegation would be implausible.   Even before *Twombly* the law demanded the dismissal of Delta's claims for failure to plead a relevant market in terms of reasonable substitutability.[9]  This is even more clearly the result today.[10]  Unable to refute that standard, Delta retreats to arguments that are wrong as a matter of law or beside the point.

---

[9] *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963, 970-72 (W.D. Tenn. 2004).

[10] *See Chapman v. N.Y. State Div. for Youth*, No. 05-7010, 2008 U.S. App. LEXIS 21495, at *9-11 (2d Cir. Oct. 14, 2008) (a plaintiff must plead a relevant market with reference to the rule of interchangeability to state a claim); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118-19 (10th Cir. 2008) (same); *Bansavich v. McLane Co.*, No. 3:07cv702, 2008 U.S. Dist. LEXIS 89071, at *7-9 (D. Conn. Oct. 31, 2008) (same); *Spahr v. Leegin Creative Leather Prods.*, No. 2:07-CV-187, 2008 U.S. Dist. LEXIS 90079 (E.D. Tenn. Aug. 20, 2008) ("A complaint should be dismissed if the definition of the relevant market in the complaint is

Delta confuses the *rental of space to promoters* of events (the business that Delta and Van Andel are alleged to be in) and *the sale of tickets to consumers* (the business that Live Nation is alleged to be in).  Because "it is axiomatic that a firm cannot monopolize a market in which it does not compete," *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998), it is the rental business—not the ticket sale business—that is relevant in defining CAA's market and determining whether CAA has monopoly power in that market.  Thus, Delta's admission that it and CAA rent not only to promoters of "Arena Musical Products" but to "other entertainment events," (FAC ¶¶ 1, 2), precludes the plausibility of Delta's proffered market, which allegedly includes only "Arena Musical Products."  Delta is in the business of renting its space, so "common economic experience," *Twombly*, 127 S. Ct. at 1971, combined with Delta's factual admission renders implausible Delta's proffered market that purports to exclude sporting events, expos, and other entertainment events.

Indeed, Delta's reliance on *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001)—decided before *Twombly, see Chapman*, 2008 U.S. App. LEXIS 21495, at *9-11 (citing *Todd*, but granting motion to dismiss where plaintiff failed to plead reasonable interchangeability)— underscores the fatal deficiencies in Delta's allegations.  In *Todd*, the Second Circuit held that the plaintiff alleged a plausible market where defendants had tracked the wages of employees in the alleged market (thus implicitly recognizing the class of employees that comprised the alleged market).  By analogy, Delta argues here that the PPA "estop[s] defendants from denying … that such a market exists."  (Opp. at 26; *see also id.* at 27-28.)   The analogy breaks down in light of Delta's actual allegations.  As Delta admits, the PPA focuses not just on "Arena Music Events" but applies to *all* "music concert[s] and other entertainment event[s]."  (Opp. at 26.)

---

implausible or not tenable. … Requiring plaintiffs to provide more factual support for their conclusory allegations in their complaint is just the kind of 'threshold plausibility' the Supreme Court required in *Twombly*." (quotations and citations omitted)).

11

Delta argues that defendants "ignore the fact" that Delta has pled that it has been "unable to replace the lost Arena Musical Products caused by the Competitor Arena Revenue Siphoning with other non-Musical events." (Opp. at 26.)  This misses the point:  Delta's allegation that it is not making as much money as it would like from rentals to non-Live Nation events does not, if true, show that rentals earned from other events are not reasonable substitutes for rentals earned from Live Nation's Arena Musical Products.  *See Queen City Pizza*, 124 F.3d at 438 ("The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but commodities reasonably interchangeable by consumers for the same purposes." (quotations omitted)).   There is finite demand in any market, and the fact that one competitor has won business away from another does not show that the portion (or, in some cases unique brand) that went to the winner is somehow a "market."  *See Little Caesar Enters., Inc. v. Smith*, 34 F. Supp. 2d 459, 477 n.30 (E.D. Mich. 1998) ("Courts have consistently refused to consider one brand to be a relevant market of its own when the brand competes with other potential substitutes." (citing cases)).  The plausible inference from Delta's argument is not that some gerrymandered market exists, but that Delta is not sufficiently attractive—and competition for events is so strong—that it cannot earn the rents that it would like.

In short, Delta supplies no plausible reason why it can, on the one hand, host any type of event, but, on the other, the Court should limit the market to those events that Delta allegedly lost as a result of the PPA.  Dismissal is proper because Delta fails "even to attempt a plausible explanation as to why a market should be limited in a particular way."  *Todd*, 275 F.3d at 200.

## C.     Delta Fails To Show That It Has Pled Market Power

Delta fares no better in responding to defendants' showing that they lack market power in the alleged market.  (SMG Br. at 18-20.)  First, Delta offers no response to defendants' argument that Delta's theory of market power is implausible because it makes defendants' alleged market power entirely a function of Live Nation's alleged market power.  (*Id*. at 19.)  Live Nation could decide at any moment to rent space at other arenas whether inside West Michigan or outside

events at the Van Andel Arena—a fact that Delta does and cannot not dispute.   (Delta's argument that concert goers come from within a 60-mile radius is another instance of its confusion of the markets—the location of concert goers relates to the ticket sales market, not the rental market that Delta attempts to plead.)  As a result, even with the PPA in place, defendants do not "control" the alleged Arena Musical Products market.

Delta responds that this Court can *infer* market or monopoly power from the conclusory allegation that fewer concerts come to West Michigan as a result of the PPA and that the PPA therefore decreases output.  (Opp. at 35.)  Under *Twombly*, this inference must be plausible, and it is not for several reasons.  First, this allegation says nothing about output in the market in which CAA is alleged to have market power—arena rentals.  The complaint does not and cannot allege that the number or capacity of arenas has declined.   Second, Delta ignores its own allegation that Live Nation—not defendants—"controls" which concerts come to West Michigan in the first place.  (Opp. at 34 ("Live Nation controls 90% of the Arena Musical Products in the Market and … CAA holds or controls 75% to 80% of the Arena Musical Products *placed in* the market.") (emphasis added); FAC ¶ 32.)  Third, if the PPA had the effects that Delta alleges, Live Nation (a purported national monopolist) would never have entered into it.  It is simply implausible that the Van Andel Arena has forced Live Nation to enter into the PPA, and that the PPA in turn forces Live Nation to send fewer events to Western Michigan.  If the PPA resulted in Live Nation sending fewer events to Western Michigan, Live Nation would make less money with the PPA than without it.  *See Schor v. Abbott Labs.*, 457 F.3d 608 (7th Cir. 2006) ("The monopolist can take its profit just once; an effort to do more makes it worse off and is self-deterring.") (citing 9 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 1706a, 1706b (2d ed. 2000)).  There thus would be no reason for it to enter into the PPA.  Delta's related argument that the Court should *infer* market power from its conclusory allegation that defendant's behavior has caused "prices" to rise (Opp. at 34; FAC ¶ 30) fails for similar reasons.  Delta cannot plausibly allege that defendants have the power to control ticket prices because it alleges that Live Nation (not defendants) sells tickets and controls ticket prices.  (FAC ¶ 30.)  Live Nation

13

will set ticket prices at the level that maximize its profits, and it is not plausible that it would enter into an agreement that would force it to price at uncompetitive levels.

> **D.     Delta Fails To Show That It Has Pled Anticompetitive Effects And Antitrust Injury**

Finally, Delta does not point to any allegations that adequately plead that the PPA has anticompetitive effects and that Delta has suffered an antitrust injury.  To the contrary, Delta makes the stunning (but inescapable) admission that "if the CAA and Live Nation had entered into a contract where the Van Andel Arena *lowered its* price by one-third of Live Nation's gross profits at Van Andel Arena for competitive advantage, no anti-trust injury would lie."  (Opp. at 33.)  That proposition is correct, because the injury to Delta from such an act—reduced Live Nation rental revenues—is injury to a competitor that does not reflect injury to competition.  In the FAC, Delta complains about exactly the same injury—reduced Live Nation rental revenues. Delta's attempts to argue around this fact fail.

For starters, Delta does not refute defendants' showing that exclusive dealing agreements are prima facie procompetitive.  (SMG Br. at 20 (collecting cases).)  *See also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329, 334 (1961) (refusing to recognize that exclusive dealing agreements are per se illegal); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (discussing the "well-recognized economic benefits to exclusive dealing arrangements"); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1234 n.17 (8th Cir. 1987) (same). Because, under *Twombly*, at the pleading stage a court cannot infer anticompetitive effects from facts that are competitively "neutral," Delta must plead facts that, if proven, would show that the PPA has anticompetitive effects.  (SMG Br. at 15-16.)

Delta argues that the PPA has anticompetitive effects because arenas that do not have the benefit of the PPA must charge more to offset their losses.  (Opp. at 29.)  This, of course, is exactly the same effect as Delta's hypothetical discount would have.  Delta also argues that, because of the PPA, its own "costs" have risen.  (*Id.* at 31 ("[T]he intrusion of an additional, third party—the CAA and SMG—into the market cost equation at the West Michigan Arena

14

Competitors is driving up costs …").)   The PPA, however, has nothing to do with *Delta's costs*—the FAC and the PPA itself make it clear that the PPA governs Live Nation and CAA's allocation of *Live Nation's revenues*.   Leaving aside the rhetoric, the alleged impact of this agreement is that the PPA causes Delta to earn less rent from Live Nation, and this again is exactly the same effect that Delta's hypothetical discount would have.   (FAC ¶ 30.)   For several reasons, Delta's response is legally untenable.

First, Delta's unhappiness with the fact that Live Nation has chosen to favor Van Andel over the DeltaPlex and that, as a result, the DeltaPlex has allegedly charged promoters higher rent to offset its corresponding losses says nothing about why the PPA is different from any exclusive dealing agreement.   The natural effect of an exclusive dealing agreement is always to deprive competitors of the economic benefits that attend such an agreement.   "[V]irtually every contract to buy 'forecloses' or 'excludes' alternative sellers from some portion of the market, namely the portion consisting of what was bought."   *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.).   As a matter of law, the "mere adverse effect" that any agreement (exclusive or not) inflicts "on a firm's business is insufficient to establish an anticompetitive effect, absent proof that such adverse effect also impairs competition in the marketplace as a whole."   *Total Benefits Planning Agency Inc. v. Anthem Blue Cross and Blue Shield*, No. 1:05cv519, 2007 U.S. Dist. LEXIS 53862, at *19 (S.D. Ohio July 25, 2007) (granting motion to dismiss for failure to plead anticompetitive effects) (citing *Ace Beer Distrib., Inc. v. Kohn, Inc.*, 318 F.2d 283, 287 (6th Cir. 1963)).   As the Sixth Circuit has explained, "there is no economic rationale to restrict, as a violation of Section 1, a buyer's latitude"—in this case Live Nation's—"in selecting the entity from whom it will purchase products or services."   *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 347 (6th Cir. 2006).   Filing a complaint that labels that effect "anticompetitive" is therefore not enough.   *Twombly*, 127 S. Ct. at 1964-65 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do …" (quotations and alterations omitted)).

15

Second, Delta's claim that Sixth Circuit exclusive dealing cases are distinguishable because the plaintiffs in those cases failed to allege that the defendant drove up the plaintiff's costs is likewise a non-starter.  (Opp. at 31.)  In *NicSand*, the plaintiff *did* allege that its competitor's exclusive dealing agreements with its customers caused it to lose its economies of scale and that, as a result, the agreement caused its "'raw material costs'" to "'increase[] dramatically,'" ultimately driving it to bankruptcy.   507 F.3d at 448-49 (citing complaint).  Although the exclusive dealing agreements allegedly *caused* these effects, the Sixth Circuit held that NicSand did not allege injuries that resulted from *harm to competition*.  Moreover, while the plaintiff in *Indeck Energy Services v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000), did not allege that its costs increased, *NicSand* makes clear that this is a distinction without a difference.  Under *Indeck*, allegations of exclusive dealing are insufficient where a plaintiff (like Delta) had the opportunity to compete prior to the awarding of an exclusive dealing contract for business that its competitor won.  *Id.* at 977.  (SMG Br. at 20-24.)[11]  The relevant competition is competition to win the contract.  *Expert Masonry*, 440 F.3d at 347-48.[12]

---

[11] Delta relies on *Todd* to argue that defendants "fragment the product and market to only look at arena rental rates" and that, "in the arena musical event market, the overall product or ticket costs are obviously a function of the promoter's costs as well as the arena rates."  (Opp. at 30.)  *Todd* is inapposite:   there the court considered whether allegations that defendant-buyers (oligopsonists) exchanged salary information was sufficient to state a claim for a horizontal price fixing.  275 F.3d at 195.  Here, Delta does not plead a horizontal conspiracy; it pleads that there are five competitors vying for Live Nation's business.  (FAC ¶ 9.)  Moreover, the Second Circuit stated that a plaintiff must plead the presence of a "market structure" that is highly concentrated and centered around a fungible product that has inelastic demand.  *Id.* at 207-11.  Delta does not allege this.

For similar reasons, *Midwest Gas Services, Inc. v. Indian Gas Co.*, 317 F.3d 703, 711 (7th Cir. 2003)—a pre-*Twombly* decision—is inapposite.  There, the district court granted defendants' motion to dismiss four antitrust claims.  On appeal, the Seventh Circuit affirmed on all claims but one, holding that plaintiff's allegation that defendants conspired to exclude it from the market was enough to plead that defendant constrained competition.  The FAC lacks any similar plausible allegation here.

Finally, Delta purports to refute *Leak v. Grant Medical Center*, 893 F. Supp. 757 (S.D. Ohio 1995), *aff'd*, 103 F.3d 129 (6th Cir. 1996).  (Opp. at 31-32.)  *Leak* is instructive here.  In *Leak*, the court affirmed a finding that the plaintiff failed to show antitrust injury where the plaintiff's case rested on claims that defendant's exclusive dealing agreements caused it injury.  The court reasoned that if the plaintiff provided the same or better service than its competitors then "in an open and competitive marketplace managed care insurance plans should eventually be more inclined to designate those hospitals" where plaintiff practiced.  *Id.* at 763.  The plaintiff

Third, Delta cannot distance itself from cases upholding exclusive-dealing agreements by arguing that the PPA allegedly "siphons" off rental revenue that might otherwise go to Van Andel's competitors. The flaw in Delta's argument is that the PPA says nothing about what rents Live Nation will pay to other arenas, and its profit (and loss) sharing feature is actually *less* restrictive of competition than an outright exclusive dealing arrangement. Unlike the exclusive dealing agreements discussed above, the PPA thus preserves (1) Live Nation's ability to promote events at other arenas (and thus the ability of those arenas to compete for Live Nation's business) and (2) the right of other promoters to promote events at the Van Andel Arena (and thus compete to rent space from CAA). To be sure, the PPA incentivizes Live Nation and Van Andel to work together, but it does not *require* exclusivity. The legality of standard exclusive-dealing relationships thus proves dispositive of Delta's attack on the non-exclusive agreement here.

Finally, Delta's insistence that the PPA's purported "uniqueness" supplies a basis to find that the agreement is anticompetitive is unsupportable as a matter of law. (Opp. at 4, 17, 36.) Incentive and risk-sharing agreements are not unusual or unique.[13] Even if they were, "[t]he antitrust laws were enacted for the protection of *competition*, not *competitors*." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (emphasis added) (quotations omitted). To claim that an agreement should be illegal simply because it is unusual undermines this principle and stifles innovation. *See U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 629 (1977) (as a matter of law, the fact that a tying agreement was "unique" was not enough to show market

---

thus failed to show that *competition*, as opposed to his business interests as a *competitor*, was harmed.

[12] Delta's argument that "there is no room … for Delta ... to take another 1/3 of Live Nation's gross profits …" (Opp. at 30), is not only legally inapposite, but contradicted by the FAC. (SMG Br. at 22 n.11.) Delta cannot get around the fact that the PPA itself provides that CAA and Live Nation share not only in the earnings from events outside Van Andel Arena, but also in the losses (subject to the guaranteed minimum). It is thus not plausible to infer from the facts of the complaint—which includes the terms of the PPA—that there is no "room" for Live Nation to enter into a PPA with Delta.

[13] *See, e.g., Virgin Atl. Airways v. British Airways*, 257 F.3d 256 (2d Cir. 2001) (dismissing Sherman Act claims in case that turned on legality of incentive agreements); *Gemini Concerts, Inc. v. Triple-A Baseball Club Assocs.*, 664 F. Supp. 24, 27 (D. Me. 1987) (same, following a hearing on a temporary restraining order).

power or per se illegality); *see* Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 16 (1984) (discussing need to "prefer the error of tolerating questionable conduct, which imposes losses over a part of the range of output, to the error of condemning beneficial conduct, which imposes losses over the whole range of output").  Yet that is what Delta demands here.  Live Nation chose to enter into an agreement with CAA (be it because the Van Andel Arena was the nicest or largest or best run facility) that made it beneficial for Live Nation to place events at Van Andel and guaranteed a $1.4 million benefit to CAA.  Delta failed to secure a similar agreement for the DeltaPlex and, allegedly unable to make up the lost rents, Delta seeks recovery from the legal system.  Absent factual allegations that would lead to the plausible conclusion that the PPA is not simply unusual, but harmed competition, *Twombly* requires dismissal.

## III.     DELTA DOES NOT ADEQUATELY PLEAD A § 1983 CLAIM

### A.     Delta Does Not Allege The Deprivation Of A Property Right

Delta's opposition makes clear that it does not have a § 1983 claim.  Delta stakes its § 1983 claim on its theory that the PPA is an unconstitutional taking of Delta's property rights without just compensation.  (Opp. at 37.)  Delta's theory founders because the *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), regulatory takings analysis on which it relies does not provide private plaintiffs redress any time that they suffer any pecuniary loss as a result of government action.   Instead, *Penn Central* reaffirms that the government can, without compensation, impose general regulations that may even severely limit the value of an ongoing business so long as those regulations do not disproportionately target or affect any one property owner.  *Id.* at 131.  Applying *Penn Central*'s three prongs, that is the case here.

*First*, Delta does not allege that the PPA has the "character" of a physical invasion.  *Penn Central*, 438 U.S. at 124 ("A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by the government …").  *Second*, when a plaintiff advances a theory premised on lost rents, courts look at the lost rents relative to the rents the property owner *would accrue over the entire useful life of the property*.  *Cienega Gardens v.*

18

*United States*, 503 F.3d 1266, 1280 (Fed. Cir. 2007); *see also Penn Central*, 438 U.S. at 130-31 (rejecting as "simply untenable" plaintiff's takings theory which looked at losses in isolation). Only if the plaintiff shows a loss of at least 85 percent of the value of the lost rents does a plaintiff then state a claim. *Arctic King Fisheries, Inc. v. United States,* 59 Fed. Cl. 360, 384-85 (Fed. Cl. 2004) ("This court likewise has generally relied on diminutions well in excess of 85 percent before finding a regulatory taking."). Delta does not plead that the lost Live Nation rents have so diminished the DeltaPlex's economic value.

*Third*, Delta does not plead that it had an investment-backed expectation in Live Nation's business when it opened for business. Delta had an investment-backed expectation that it would be able to rent the DeltaPlex out *generally*. The PPA does not interfere with that right. Indeed, Delta does not plead that it had an investment backed expectation that it would always be able to contract with Live Nation—nor could it since it never entered such an exclusivity arrangement. As in *Penn Central*, the state action does not interfere with Delta's "primary" expectation concerning the use of the parcel, because it "not only permits but contemplates that [Delta] may continue to use the property precisely as it has been used" since its inception. 438 U.S. at 136.

In short, Delta cannot show that its lost rental revenues resulting from a quasi-exclusive dealing agreement between defendants and Live Nation constitutes a cognizable taking under the Fifth Amendment. Indeed, if a taking were found here, there would be a taking anytime that a state created a public facility that reduced the use of a private facility or anytime that a state delegated authority to one private entity to manage its affairs to the exclusion of others. Courts have thus rejected claims that a municipality's decision to confer exclusive rights or more favorable rights to one actor rises to the level of a Fifth Amendment violation. *See, e.g., Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1082 (1st Cir. 1993) (holding that a city did not violate the Takings Clause by adopting a city ordinance that monopolized garbage collection and eliminated competition in the market for recyclable waste); *Hybud Equip. Corp. v. City of Akron*, 654 F.2d 1187, 1193 (1981), *vacated on other grounds*, 455 U.S. 931 (1982) (same). The same result should obtain here.

19

**B.** **Delta Concedes SMG's Qualified Immunity From Liability Under § 1983**

Finally, Delta fails to address the fact that SMG has qualified immunity from § 1983 liability. As SMG explained in its opening brief, private defendants are entitled to qualified immunity from § 1983 claims where (1) they "perform[] services at the behest of the sovereign" or act as the agent of a governmental entity and (2) "their conduct does not violate clearly established statutory or constitutional rights of which a *reasonable person* would have known." *Cullinan v. Abramson*, 128 F.3d 301, 309-10 (6th Cir. 1997) (quoting *Richardson v. McKnight*, 521 U.S. 399, 407 (1997), and *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Delta makes allegations that satisfy the first element of this test, and fails to allege any "clearly established statutory rights" that SMG could have violated, thus satisfying the second element.

## IV.    DELTA FAILS TO SUSTAIN ITS STATE LAW CLAIMS

As defendants showed in their opening briefs, Delta's state law claims fail as a matter of law and should be outright dismissed for this reason. (SMG Br. at 27-28; CAA Br. at 23-29.) Additionally, Delta's state law claims all seek to challenge the actions of a state municipal authority and its agent based on theories of state law and matters of state procedure, including the Open Meetings Act, the Michigan Freedom of Information Act, and notions of ultra vires conduct. Delta does not and cannot refute that such claims are quintessentially best left to the Michigan state judiciary to resolve. There is thus no need for this Court to reach out to entertain those claims, and there is good reason in our federal system for the Court not to tread in such areas. *Omni Outdoor*, 499 U.S. at 372-73. Accordingly, defendants submit that the Court should dismiss Delta's state law claims or, alternatively, decline to exercise supplemental jurisdiction.[14]

### CONCLUSION

For the reasons set forth in this Reply Brief and defendants' motions to dismiss, defendants respectfully request that this Court dismiss the First Amended Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

---

[14] As SMG noted in its opening brief (SMG Br. at 27), this Court should dismiss the state antitrust claim because the interpretation of the Michigan state antitrust statute must follow the interpretation of the Sherman Act. That decision as well, however, is best left to the state courts.

20

Date: November 25, 2008

Respectfully submitted,

/s/ E. Marcellus Williamson__
E. Marcellus Williamson
Amanda P. Reeves
Jason D. Cruise
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
marc.williamson@lw.com
amanda.reeves@lw.com
jason.cruise@lw.com

Thomas J. Heiden
Timothy B. Hardwicke
LATHAM & WATKINS LLP
Sears Tower
233 S. Wacker Drive, Suite 5800
Chicago, IL  60606
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
thomas.heiden@lw.com
tim.hardwicke@lw.com

*Attorneys for SMG*

/s/ Richard A. Glaser__
Richard A. Glaser
Erin E. Gravelyn
DICKINSON WRIGHT PLLC
200 Ottawa Avenue, NW, Suite 900
Grand Rapids, MI  49503
Telephone:  (616) 458-1300
Facsimile:  (616) 458-6753

*Attorneys for Grand Rapids – Kent County*
*Convention/Arena Authority*