UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DELTA TURNER, LTD.,

                Plaintiff,                                Case No. 1:08-cv-544

v.                                               HON. JANET T. NEFF

GRAND RAPIDS - KENT COUNTY
CONVENTION/ARENA AUTHORITY,
a Michigan Municipal Authority,
and SMG, a Pennsylvania General Partnership,

                Defendants.
_____/


## OPINION

      This case presents an unusual application of federal antitrust principles to the entertainment industry.  At issue is whether a "Preferred Promoter Agreement" (PPA) negotiated on behalf of defendants Grand Rapids - Kent County Convention/Arena Authority (CAA) and its manager, SMG, that includes a reciprocal agreement with the promoter Live Nation for sharing arena and promoter revenue from competitor events, violates antitrust laws.  Pending before the Court are CAA's and SMG's separate Motions to Dismiss.  For the reasons that follow, the Court grants in part, and denies in part, defendants' motions.

### I.  Summary of Analysis

      Defendants have filed Motions to Dismiss pursuant to FED. R. CIV. P. 12(b)(6).  As a procedural device, Rule 12(b)(6) establishes the trial court as the sentinel standing guard at the border between viable and deficient causes of action.  As emphasized in *Bell Atlantic Corp. v.*

*Twombly,* 550 U.S. 544; 127 S. Ct. 1955 (2007), this is a particularly important charge in antitrust litigation given the often obscure or weak antitrust premise and sometimes immense expense of mounting even a preliminary defense of the merits.

The essential role of the Court in this case falls squarely within the fundamental Rule 12(b)(6) charge:  the foremost question to be decided is whether plaintiff's allegations of antitrust violations meet the threshold for causes of action under § 1 or § 2 of the Sherman Act such that this case may proceed to the discovery stage.  Defendants contend that plaintiff's claims must be dismissed since they fail outright in numerous respects.  While plaintiff's antitrust case is by no means clear-cut, the Court is convinced after careful consideration of the pleadings, arguments and legal principles, that plaintiff's antitrust claims are not properly dismissed at this juncture.  The Court recognizes that plaintiff faces the burden of proving the anticompetitve effects of the PPA to secure relief on its claims of antitrust violations.  Nonetheless, the Court is convinced that plaintiff's burden can legitimately fail or succeed only with further development of the factual record and the proper application of the correct legal principles.  This is particularly so given the lack of any factual record as to the genesis, purpose, and effect of the PPA.

In short, the Court finds, based on the parties' arguments, that plaintiff's antitrust claims are not merely speculative, but instead plausible, and thus, not subject to dismissal pursuant to Rule 12(b)(6).  To the contrary, the Court concludes that plaintiff's claim under 42 U.S.C. § 1983 does not "possess enough heft" to survive dismissal.  *Twombly,* 127 S. Ct. at 1966.  The Court also declines to exercise its discretion to grant plaintiff's request for a declaratory judgment declaring that the PPA is *ultra vires*, illegal, and unenforceable under state law.  Plaintiff has failed to show

that such relief is warranted.  Finally, given that the parties have only briefly addressed the remaining state law claims, dismissal at this stage of the proceedings is unjustified.

## II.  Background and Facts

This case involves a dispute over contracts for event bookings at the DeltaPlex and Van Andel Arena in Grand Rapids, Michigan.  Plaintiff Delta Turner owns and operates the Delta Plex. Defendant CAA owns, and defendant SMG manages, Van Andel Arena.  At issue is a PPA that SMG entered into with Cellar Door Productions of Michigan, Inc. (Live Nation), which (1) gives SMG/CAA two-thirds of the net revenue from events at Van Andel Arena that are promoted or produced by a promoter other than Live Nation, and gives Live Nation the remaining one-third; and (2) requires that Live Nation pay SMG/CAA one-third of the net revenue from Live Nation events at competitor venues in the surrounding west Michigan area (DeltaPlex, Kellogg Arena in Battle Creek, Wings Stadium in Kalamazoo, and the LC Walker Arena in Muskegon).  Plaintiff alleges that this latter feature of the PPA, referred to by plaintiff as "Competitor Arena Revenue Siphoning," is intended to monopolize arena events and revenues and thereby inhibit interstate commerce by (1) limiting the number of concerts and directing most or all of the concerts to Van Andel Arena, and (2) raising the costs of concerts, thereby generating more revenue for defendants.  Plaintiff further alleges that the net effect of this contractual arrangement is that fewer concerts come to West Michigan or they come at a higher cost to Van Andel Arena competitors and the general public because Live Nation must increase ticket prices and/or reduce the rent paid to competitors to cover the "cut" to SMG/CAA.

Plaintiff initially filed a five-count complaint alleging federal and state antitrust violations, a violation of 42 U.S.C. § 1983, and three state law claims.  The Court stayed discovery in light of

defendants' pending Motions to Dismiss.  On October 3, 2008, plaintiff filed a First Amended Complaint, alleging seven counts: **Count 1**–Violation of Federal Antitrust Act (the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and the Clayton Act 15 U.S.C. §§ 4, 15, and 22) [against CAA and SMG]; **Count 2**–Violation of State Antitrust Act [against CAA and SMG]; **Count 3**–Violation of 42 U.S.C. § 1983 [against CAA and SMG]; **Count 4**–Declaratory Judgment—PPA's Competitor Arena Revenue Siphoning is Ultra Vires [presumably against CAA and SMG]; **Count 5**–Tortious Interference with Prospective Business Advantage [against CAA and SMG]; **Count 6**–Violation of Open Meetings Act and CFAA (Michigan Convention Facility Authority Act, MICH. COMP. LAWS § 141.1401 *et seq*.) [against CAA]; and **Count 7**–Violation of the Freedom of Information Act and CFAA [against CAA)].  Defendants have moved to dismiss all claims.

### III.  Issue

Whether defendants are entitled to dismissal of the alleged federal claims on the basis (1) of immunity under the *Parker* state action doctrine, *Parker v. Brown,* 317 U.S. 341 (1943); (2) of immunity under the Local Government Antitrust Act of 1984 (LGAA), 15 U.S.C. § 34 to § 36; (3) of failure to meet the pleading standard of *Twombly*; (4) of failure to plead a claim under 42 U.S.C. § 1983 and qualified immunity; and (5) that the Court should decline to exercise its discretion to provide declaratory relief?

### IV.  Legal Standard

In deciding a motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6), the court must treat all well-pleaded allegations in the complaint as true and draw all reasonable inferences from those allegations in favor of the nonmoving party.  *Lambert v. Hartman,* 517 F.3d 433, 439 (6th Cir. 2008); *Moon v. Harrison Piping Supply,* 465 F.3d 719, 723 (6th Cir. 2006).  "A

claim survives this motion where its '[f]actual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.'" *Zaluski v. United Am. Healthcare Corp.,* 527 F.3d 564, 570 (6th Cir. 2008) (quoting *Twombly,* 127 S. Ct. at 1959). Stated differently, the complaint must present "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 127 S. Ct. at 1974.[1]

"'A motion to dismiss for failure to state a claim is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations.'" *Lambert,* 517 F.3d at 439 (quoting *Golden v. City of Columbus,* 404 F.3d 950, 958-59 (6th Cir. 2005)). The factual allegations in a complaint need not be detailed, but they must go beyond mere speculation of a legally cognizable cause of action. *Lambert,* 517 F.3d at 439. "The complaint should give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *German Free State of Bavaria v. Toyobo Co, Ltd.,* 480 F. Supp. 2d 958, 963 (W.D. Mich. 2007). Accordingly, the complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under a viable legal theory. *Id.*; *see also Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 726 (6th Cir. 1996).

---

[1] The Rule 12(b)(6) "plausibility standard" established in *Twombly* unquestionably applies to plaintiff's antitrust claims, since that was the legal context from which the standard arose. However, the courts are not universal in accepting the *Twombly* standard for cases that do not involve antitrust claims. *See Total Benefits Planning Agency, Inc. v. Anthem BCBS,* No. 07-4115, December 22, 2008, 2008 U.S. App. LEXIS 25810, * 8-9 n.2 (also citing Note, *Much Ado About Twombly*, 83 NOTRE DAME L. REV. 1811 (2008)). Regardless, the Court does not find that any distinction would alter the disposition with respect to any particular claim in this case.

V.   Analysis

A.   Federal Antitrust Claim (Count 1)

Defendants argue that they are entitled to dismissal of plaintiff's federal antitrust claim, Count 1, on the grounds that (1) they have immunity from suit under either the state action doctrine or the LGAA, and (2) plaintiff has failed to plead an antitrust claim under the Sherman Act, based on the pleading standard in *Twombly*.  At this juncture in this case, the Court is not persuaded that dismissal is mandated on the grounds asserted.

1.   State Action Doctrine Immunity

Under the state action doctrine, antitrust laws generally do not apply to a state operating in its sovereign capacity, or to private conduct approved and supervised by the state as a matter of state policy.  WILLIAM C. HOLMES, ANTITRUST LAW HANDBOOK (Thompson-West, 2007-2008 ed.) § 8.7, pp. 789-90.  The test for determining whether the state action doctrine applies depends on the <u>nature of the defendant</u> (state legislature, state agency, local government body, private party) and the <u>challenged conduct</u> (legislative directive, agency ruling, private activity).  *Id.* at 790 (citation omitted).  At one extreme, if the challenged action is by the state legislature or state supreme court, then the exemption is classified as "complete," with no further inquiry.  *Id.* at 790-91.  However, at the other end of the spectrum, when the defendant is a private party, a more stringent standard applies.  *Id.* at 793.  The Supreme Court explained its rationale for this differing standard:

> Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.  Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement.  The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals.  This danger is minimal, however, because of the requirement

6

> that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

*Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 47 (1985); *see also* HOLMES, *supra*, § 8:7, p. 793. A private party defendant must demonstrate that the particular conduct challenged as anticompetitive was both authorized by the state as a matter of "clearly articulated and affirmatively expressed state policy," and was subjected to "active state supervision" to protect against possible abuse. HOLMES, *supra*, § 8:7, p. 793.

If the defendant is a municipality or other local government entity, an intermediate standard applies. *Id.* at 793-94. Active supervision by a higher state body is not required since "[o]nce it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function." *Hallie,* 471 U.S. at 47; *see also* HOLMES, *supra*, § 8:7, p. 794. It is sufficient if the municipality is acting pursuant to a "clearly articulated state policy" reflected in actual legislation or high state court decisions, where the challenged conduct is a foreseeable consequence of what the state law authorizes. HOLMES, *supra*, § 8:7, p. 795 (citing *Hallie,* 471 U.S. at 41-43).

Ultimately, whether CAA and/or SMG is entitled to immunity under the state action doctrine depends on application of the distinct tests for municipalities as opposed to private actors. It also depends on consideration of additional nuances of the doctrine or exceptions, which may apply under the circumstances of this case, given the relationship between CAA and SMG and the role carried out with respect to the PPA.

a.  CAA—Municipality Immunity

As established in *Parker,* 317 U.S. 341, the general test for whether state action immunity applies to CAA as a municipality is:[2]

> whether the municipality is acting pursuant to "clearly articulated state policy" reflected in actual legislation or high state court decisions, where the challenged conduct is a foreseeable consequence of what the state law authorizes.

HOLMES, *supra*, § 8:7, p. 795 (citing *Hallie,* 471 U.S. at 41-43).  Stated differently, the municipality "must demonstrate that [its] anticompetitive activities were authorized by the State 'pursuant to state policy to displace competition with regulation or monopoly public service.'" *Hallie,* 471 U.S. at 39 (quoting *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 413 (1978) (opinion of BRENNAN, J.)).  A municipality need not point to a specific, detailed legislative authorization to assert state action immunity.  *Hallie,* 471 U.S. at 39.

CAA argues that it meets the requirement for state action immunity because it is authorized by a <u>clearly articulated state policy</u>, the CFAA, to engage in conduct that <u>logically could result in the suppression of competition</u>.  The Court does not view the mandates of the CFAA as so clearly encompassing the conduct at issue to warrant a Rule 12(b)(6) dismissal of the claim, particularly given the aspect of the PPA that shares revenue from competitor arenas under the so-called "Competitor Arena Revenue Siphoning" provisions.  It is not clear that the challenged conduct is a "foreseeable consequence of what the state law authorizes."

---

[2] There appears to be no dispute that CAA is classified as a municipality/local government entity.

Moreover, immunity is less justified in this case because the anticompetitive conduct is not regulatory activity, but instead is commercial market activity.  In *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 374-75 (1991), the Court distinguished situations in which the government body acts not in a purely regulatory capacity, but as a market participant.  HOLMES, *supra*, § 8:7, p. 808.  The Court stated:

> The rationale of *Parker* was that, in light of our national commitment to federalism, the general language of the Sherman Act should not be interpreted to prohibit anticompetitive actions by the States in their governmental capacities as sovereign regulators.  The sentences from the opinion quoted above simply clarify that this immunity does not necessarily obtain where the State acts not in a regulatory capacity but as a commercial participant in a given market.

*Omni Outdoor,* 499 U.S. at 374-75.  Here, the entertainment contracts fall into the category of commercial market activity, and thus, CAA would be less entitled to immunity under the rationale of *Parker*.

### b.  SMG—Private Party Immunity

The general test for whether state action immunity applies to SMG as a private party is two prong:

(1)     the party must show that it is acting pursuant to <u>clearly articulated state policy</u> reflected in actual legislation or high state court decisions, where the challenged conduct is a foreseeable consequence of what the state law authorizes, and

(2)     the party must show <u>active state supervision</u>.

*California Retail Liquor Dealers Assn v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105 (1980); HOLMES, *supra*, § 8:7, pp. 798-99.  This two-prong standard, known as the *Midcal* test, was reiterated in *S.*

*Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S. Ct. 1721 (1985), in which the Court further explained the applicability of the state action doctrine to private parties. A state policy that expressly permits, but does not compel, anticompetitive conduct may be clearly articulated within the meaning of *Midcal*. *S. Motor Carriers Rate Conference,* 105 S. Ct. 1729. Nonetheless, a state may not merely give immunity to those who violate the Sherman Act by authorizing them to violate it. *Id.* at 1729 n.23. The second prong of the *Midcal* test "prevents States from 'casting ... a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement.'" *Id.* (quoting *Midcal,* 445 U.S. at 106). "This active supervision requirement ensures that a State's actions will immunize the anticompetitive conduct of private parties only when the 'state has demonstrated its commitment to a program through its exercise of regulatory oversight.'" *Id.* (citing 1 P. Areeda & D. Turner, *Antitrust Law* ¶§ 213a, p. 73 (1978)).

Subsequent decisions have further defined the limits of state action immunity for private parties. The active supervision requirement can only be met by state supervision; municipal oversight is insufficient. HOLMES, *supra,* § 8:7, p. 799 n.16 (citing *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,* 442 F.3d 410, 441 (6th Cir. 2006), rev'd and remanded 127 S. Ct. 2489 (2007)); *see also Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.,* 774 F.2d 162, 163 (6th Cir. 1985).

Antitrust immunity does not apply to a private actor to whom authority is delegated such that the private actor becomes the "effective decision maker." "[P]rivate defendants who are regulated by a municipality are entitled to protection under the state action exemption as long as the municipality is the "effective decision maker." *Mich. Paytel Joint Venture v. City of Detroit,* 287 F.3d 527, 536-37 (6th Cir. 2002). The Sixth Circuit explained:

The *Riverview*[3] line of cases thus informs us that the basic question in antitrust cases that involve municipal and private actors is whether the municipality or the regulated party made the effective decision that resulted in the challenged anticompetitive conduct.  If the municipality or a municipal agent was the effective decision maker, then the private actor is entitled to state action immunity, regardless of state supervision.  If the private actor was the effective decision maker, due to corruption of the decision-making process or delegation of decision-making authority, then it is not immune, unless it can show that it was actively supervised by the state.

*Mich. Paytel,* 287 F.3d at 537-38.  When a private actor (such as a non-profit corporation) acts on behalf of the local government but makes "'independent decisions without the input, advice, involvement, or oversight of ... any ... governmental body,'" the antitrust immunity accorded to the governmental entity does not apply.  *Id.* at 537-38 (quoting *Riverview III,* 899 F.2d at 481-82).

Under the second prong of the *Midcal* test, the state must exercise ultimate control over the challenged private anticompetitive conduct; the private entity must demonstrate both that the state has the power to exercise control over the private anticompetitive conduct and that the state in fact exercised its control.  HOLMES, *supra,* § 8:7, p. 800 n.16 (citing *Snake River Valley Elec. Ass'n v. PacifiCorp,* 357 F.3d 1042, 1049 (9th Cir. 2004)).  Also, as noted above with regard to municipal immunity, another consideration may be whether the anticompetitive conduct at issue is regulatory-related or part of the commercial market.  HOLMES, *supra,* § 8:7, p. 808; *Omni Outdoor,* 499 U.S. at 374-75.

SMG argues that it is entitled to immunity from suit under the state action doctrine.  The Court finds SMG's claim of state action immunity extremely weak under the above principles.

---

[3] *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.,* 769 F.2d 324 (6th Cir. 1985) ("*Riverview I*"); *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.,* 774 F.2d 162 (6th Cir. 1985) ("*Riverview II*"); *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.,* 899 F.2d 474 (6th Cir. 1990) ("*Riverview III*").

11

Contrary to SMG's argument, the PPA was not formed pursuant to a "clearly articulated state policy" that "authorize[d] anticompetitive conduct," *Michigan Paytel*, 287 F.3d at 536. While it is true that for state action immunity the conduct need not be *expressly* authorized by the state/legislation (in this case the CFAA), the suppression of competition must be the foreseeable or logical result of what the state authorizes. *Id.* at 535. At this early stage of the proceedings, with no development of the record, the Court finds that any relationship between the CFAA authorization and the "Competitor Arena Revenue Siphoning" provision of the PPA is tenuous at best.

SMG contends that this case presents circumstances analogous to those in *Michigan Paytel*, in which the Court found that state action immunity applied with respect to an exclusive contract for prisoner telephones by the City of Detroit. The Court disagrees. Clearly, to operate a prison, the City of Detroit would have to solicit bids and award contracts for necessary services, which would include exclusive contracts such as that for prisoner telephones. Similarly, the operation of Van Andel Arena would involve exclusive contracts for products and services necessary or convenient to carry out the purposes, objectives, and provisions of the CFAA (SMG Br. 7-8). However, as plaintiff argues, that would not logically or foreseeably include the PPA and its "Competitor Arena Revenue Siphoning" contract provisions.

The Court agrees instead with plaintiff that the circumstances of this case are more analogous to those in *First American Title Co. v. Devaugh,* 480 F.3d 438 (6th Cir. 2007). In *First American Title*, the Sixth Circuit concluded that the challenged anticompetitive activity by county registers, of restricting the distribution and resale of copies of recorded documents obtained by title companies, was not encompassed within the legislative authority granted to registers. *Id.* at 440, 447. Rather, the legislative authority extended only to acquiring, recording, and possessing, "the

*original official* title documents." *Id.* The court held that it was not foreseeable that the powers granted to the county registers would logically result in the challenged practices. *Id.* at 448.

Likewise, in this case, the CFAA undoubtedly authorizes the CAA to undertake certain activities related to the operation of Van Andel Arena, including contracting for essential or even beneficial services incidental to its operations. However, there is nothing before the Court in the pleadings or otherwise that persuades the Court that the CFAA would foreseeably or logically result in "marketplace contracts" to induce, reduce or otherwise regulate the activities of competitor arenas.

Further, the Court concludes that SMG has not met the second prong of the *Midcal* test, under which the private entity must demonstrate both that the state has the power to exercise control over the private anticompetitive conduct and that the state in fact exercised its control. HOLMES, *supra*, § 8:7, p. 800 n.16 (citing *Snake River Valley Elec. Ass'n,* 357 F.3d at 1049). There is no indication of such supervision. Although SMG argues that this prong is essentially met because CAA was plainly the effective decision maker, that is not evident based on plaintiff's allegations, as SMG asserts (SMG Br. 9-10).

Given the above considerations, the Court concludes based on the pleadings and the arguments that defendants are not entitled to state action immunity under the circumstances of this case. The record is devoid of any specifics concerning either defendant's role in developing, executing and overseeing the PPA, making any reasoned consideration of the immunity defenses merely superficial, and thus, unreliable for purposes of legal analysis.

## 2.  LGAA Immunity

Under the LGAA, a governmental entity may be entitled to immunity with respect to liability for damages, attorneys' fees and costs, but not injunctive relief when the claim is "based on any official action directed by a local government, or official or employee thereof acting in an official capacity."  15 U.S.C. § 36(a).  "The Act leaves intact the availability of injunctive relief (including attorney's fees) in suits against municipalities, and does not affect a plaintiff's ability to sue private party defendants for damages as well as equitable relief."  HOLMES, *supra*, § 8:7, p. 813.

> The Local Government Antitrust Act of 1984 provides that federal antitrust claimants can no longer recover compensatory damages, treble damages, costs or attorney's fees from any local government, or from any local government official or employee acting in an official capacity found guilty of an antitrust violation. The Act effectively restricts municipal antitrust liability to declaratory and injunctive relief. . . . Nevertheless, under the Clayton Act, a plaintiff who substantially prevails in an action of injunctive relief is entitled to an award of costs, including a reasonable attorney's fee.

17 MCQUILLIN MUN. CORP. § 49:97 (3rd ed.) (footnotes omitted).

Defendants contend that they are entitled to the limited immunity available under the LGAA; CAA because it "qualifies as a local government" and the conduct at issue involves "official action," and SMG because its conduct was based on official action directed by a local government, or official or employee acting in an official capacity.  Plaintiff argues that the LGAA does not shield defendants at this stage because the Act only provides immunity where the municipality has actually exercised its authority without expressly violating that authority, and where it has actively supervised the private party acting on its behalf.  *See GF Gaming Corp. v. City of Black Hawk, Colo.,* 405 F.3d 876, 886-87 (10th Cir. 2005).  Plaintiff contends that the LGAA does not shield defendants because the conduct at issue was not lawful, that is, the "Competitor Arena Revenue

14

Siphoning" is not "remotely, much less reasonably," included within the CAA's authority under the CFAA.

The factual record in this case is extremely limited; the genesis of the PPA and the role of CAA versus SMG is not yet known. Accordingly, the resolution of immunity under the LGAA cannot be definitively resolved at this stage of the proceedings. Plaintiff's claim remains generally plausible, and whether the relief sought may be limited on the basis of immunity under the LGAA is an open question. Accordingly, dismissal is unwarranted on this basis.

### 3.  Dismissal under *Twombly*

Defendants argue that plaintiff has failed to plead Sherman Act violations (Count I) under the standard announced in *Twombly*. Defendants correctly state that in *Twombly*, the Supreme Court tightened pleading requirements to discourage federal antitrust cases of questionable merit: a plaintiff must allege enough facts to nudge the "claims across the line from conceivable to plausible . . . ." *Twombly*, 127 S. Ct. at 1974. "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 1965. However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* (citation omitted). The Court concludes that plaintiff has met the standard in *Twombly*.

In *Twombly*, the court was concerned that there was at least plausible grounds to infer an agreement on which to base the alleged conspiracy. *Id.* at 1965-66. Here, there is no such concern. The existence of an agreement, or at least a draft of the agreement, is undisputed. Further, there is an initial showing that the agreement encompasses activities of competitors. The question is whether the agreement has an anticompetitive effect contrary to federal law. Plaintiff's complaint

15

is well-beyond a mere fishing expedition, and while recovery may be improbable, the complaint

passes muster under the plausibility standard.  Moreover, this case does not involve a large-scale

antitrust claim as in *Twombl*y:  "a putative class of at least 90 percent of all subscribers to local

telephone or high-speed Internet service in the continental United States, in an action against

America's largest telecommunications firms (with many thousands of employees generating reams

and gigabytes of business records) for unspecified (if any) instances of antitrust violations that

allegedly occurred over a period of seven years."  *Id*. at 1967.  Accordingly, there is not the same

concern regarding extensive and expensive discovery.

As *Twombly* makes clear, the pleading standard required for antitrust actions does not rest

on the heightened pleading requirements under FED. R. CIV. P. 9.  Instead, it remains premised on

the more liberal Rule 8(a)(2), which "requires only 'a short and plain statement of the claim showing

that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim

is and the grounds upon which it rests.'"  *Id.* at 1964, 1973 n.14, 1974 (citation omitted).  The

complaint allegations must simply render the plaintiff's entitlement to relief plausible.  *Twombly*,

127 S. Ct. at 1973 n.14.

### a.  Plausibility

Nonetheless, at the outset, defendants contend that plaintiff's antitrust theory fails under

*Twombly* because it is "fundamentally implausible in multiple respects."  The Court disagrees.

Defendants advance various arguments in this regard.  First, defendants observe that

"standing alone, there is nothing anticompetitive about an exclusive dealing agreement and certainly

nothing anticompetive about a non-exclusive one."  While defendants' statement may be true, it is

not necessarily relevant since such factors do not stand alone in this case, and thus, defendants' observation does not defeat plaintiff's claim.

Another argument defendants advance for dismissal is the implausibility of plaintiff's theory that the operator of a single arena in a single city enlisted Live Nation, an alleged nationwide monopolist, to help establish a local monopoly against its interest, i.e., to enter an agreement that forces it to raise its ticket price. Defendants assert that CAA is not the party with monopoly power over Arena Musical Products—Live Nation is. Although defendants' logic is not entirely clear to the Court, defendants contend that because Live Nation is free to take the acts that it promotes, which allegedly constitute 90 percent of the "Arena Products Musical Market," to other venues, plaintiff cannot plead that defendants have any market power, and defendants therefore cannot dictate prices that Live Nation sets for tickets, and defendants therefore cannot harm competition. This logic, however, does not acknowledge plaintiff's allegation that it is the combined or joint activity of defendants and Live Nation that is at issue (First Am. Compl. ¶ 44). *See, e.g.*, Sherman Act, § 2. Plaintiff's complaint alleges that Live Nation controls as much as 90 percent of the Arena Musical Products in the Market in a given year and that through the PPA, CAA has been able to achieve actual monopoly power since Van Andel Arena hosts 75-80 percent of the total Arena Musical Products in the Market (First Am. Compl. ¶ 32). Whether that concerted action is ultimately procompetitive, as defendants contend, or anticompetitive, as plaintiff contends, is yet to be determined.

In any event, the Court finds no argument or scenario advanced by defendants that is fatal to plaintiff's antitrust claim as a whole. Despite the Court's inquiries, the parties have provided the Court with no precedent on point for adequately evaluating the competitive effects of the revenue

17

sharing provisions of the PPA, which according to the parties is unique in the entertainment market. Defendant SMG asserts that plaintiff has alleged a vertical agreement subject to the "rule of reason." As discussed below, the rule of reason requires the application of the Court's best sense.  Until the record is further developed, and the details of plaintiff's antitrust theory are fleshed out, dismissal would be based on far greater speculation than would permitting this action to proceed to the next stage.

b.  Factual Allegations and the Rule of Reason

Defendants also argue that plaintiff has failed to plead sufficient facts to support all the substantive elements of its antitrust claim.  Plaintiff has alleged violations of the Sherman Act[4] under Section 1, which targets agreements that unreasonably restrain trade, and under Section 2, which targets monopoly conduct:

> The Sherman Antitrust Act declares illegal "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.  The Act also makes it a felony to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations."  *Id.* § 2.

*Mich Paytel*, 287 F.3d at 534.

To establish a § 1 claim, plaintiff must allege that defendants entered into an agreement, and (1) defendants' conduct occurred in a "relevant market," (2) that defendants possessed market power in the relevant market, and (3) that there were anticompetitve effects.  *Expert Masonry, Inc., v.*

---

[4] Plaintiff also alleges violations of the Clayton Act.  "The Clayton Act proscribes certain specific activities in commerce and also provides for private enforcement of the federal antitrust laws."  17 MCQUILLIN MUN. CORP. § 49:97 (3rd ed.) (footnote omitted).  Because plaintiff's substantive claims fall under the prohibitions of the Sherman Act, the parties' arguments and the Court's analysis are directed to the Sherman Act.

*Boone County, Ky.,* 440 F.3d 336, 343, 348 (6th Cir. 2006); *Worldwide Basketball & Sport Tours, Inc. v. NCAA,* 388 F.3d 955, 959 (6th Cir. 2004). To establish a § 2 monopolization claim, plaintiff must allege "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition, maintenance, or use of that power either by anticompetitive or exclusionary means." *Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.,* 833 F.2d 606, 612 (6th Cir. 1987).[5]

Defendants argue that under either § 1 or § 2 of the Sherman Act, plaintiff must allege (1) the "market" at issue, (2) that defendants have market power or monopoly power, and (3) whether defendants' conduct has anticompetitive effects (and has caused plaintiff to suffer an antitrust injury). Defendants argue that plaintiff has failed to allege facts to establish these requisite elements. Applying the pleading standard from *Twombly*, the Court disagrees.

With regard to the "market," defendants argue that plaintiff fails to define the relevant product market with reference to the rule of reasonable interchangeability, which is fatal to plaintiff's prima facie case. While the Court agrees that definition of the relevant market involves consideration of the product substitutability, the Court does not find plaintiff's pleadings so deficient in this regard that dismissal is warranted, on the circumstances of this case, for plaintiff's failure to properly analyze the parameters of the relevant market.

Defendants assert that "[t]he essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available

---

[5] For purposes of the Motions to Dismiss, the Court accepts defendant SMG's statement of the general elements of claims under § 1 and § 2 of the Sherman Act. However, the Court recognizes that the precise showing required to prove a claim under these sections may ultimately depend on the specific nature and category of the antitrust claim. *See, e.g., J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.,* 485 F.3d 880, 887 (6th Cir. 2007) (referring to antitrust law specific to the Sixth Circuit); *see also* HOLMES, *supra,* § 2:2, pp. 104-05 and § 3:2, pp. 402-03 (identifying and differentiating categories of antitrust claims).

substitutes for the defendant's product or service." *White & White, Inc. v. Am. Hosp. Supply Corp.,* 723 F.2d 495, 500 (6th Cir. 1983). Defendants argue that plaintiff's incorrectly allege the relevant market as the "Arena Musical Product," market, i.e., "large musical concerts, with over 3,000 fans performed by nationally touring musicians." Defendants contend that the relevant market is in fact all events that could come to area arenas, including *non-Arena Musical Product* events, since defendants and the other West Michigan arenas are in the business of renting arenas. Defendants thus contend that plaintiff's complaint is deficient because it contains no factual allegations as to why *non-Arena Musical Product* events, such as sporting events, expos, and other entertainment events, are not reasonable substitutes for earning arena revenues.

Defendants also assert that plaintiff confuses the *rental of space to promoters,* which is the business of plaintiff and Van Andel Arena, with the *sale of tickets to consumers,* which is Live Nation's alleged business. Defendants argue that because "it is axiomatic that a firm cannot monopolize a market in which it does not compete," *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1062 (2d Cir. 1996), vacated on other grds, 525 U.S. 128 (1998), defendants are entitled to dismissal. The Court is unpersuaded by defendants' arguments as a basis for dismissal. Given the nature of plaintiff's antitrust claims, the allegations of concerted action between defendants and Live Nation, and the allegation that Live Nation dominates the Arena Musical Product Market, it is not evident that the relevant market must be defined to include non-Arena Musical Product events. Likewise, given the circumstances of this case and the context of the allegations, defendants' characterization of the arena business as distinct from that of Live Nation does not generally defeat plaintiff's claims.

20

Plaintiff alleges claims under both § 1 and § 2 of the Sherman Act. These claims are clearly distinct and require independent analysis based on the relevant facts and applicable legal principles.

It is undisputed that plaintiff's claim under § 1 is subject to the "rule of reason." The rule of reason is a flexible standard that requires a general inquiry into whether, under "all the circumstances," the challenged practice imposes an unreasonable restraint on trade:

> Relevant circumstances can include such diverse factors as the defendants' intent and purpose in adopting the restriction; the structure of and competitive conditions within the affected market; the relative competitive positions and market power of the defendants; the presence of economic barriers inhibiting the ability of competitors to respond and offset the challenged practice; and apparent justifications for the restriction such as enhanced efficiencies, protection of product or service goodwill, and inducing dealer loyalty. No single such factor is decisive. Rather, the factfinder "weighs all of the circumstances" in deciding whether the challenged practice is, on balance, competitively unreasonable, with courts commonly phrasing the inquiry in terms of shifting burdens of proof.

HOLMES, *supra*, § 2:10, pp. 172-74 (citations omitted).

While a necessary first step for the rule of reason inquiry is generally the identification of the relevant market, this threshold requirement is not always essential. *Id.* at 178. "Rather, direct evidence of anticompetitive effects, such as reduced output or supracompetitive prices, can obviate the need for a more rigorous market analysis, provided that the rough contours of the market are sufficiently known and obvious for the trier to assess the plausibility of the claimed anticompetitive effects without going through a full-blown market inquiry." *Id.* (citing *F.T.C. v. Indiana Fed'n of Dentists,* 476 U.S. 447 (1986)).

Likewise, § 2 monopolization claims generally require proof of the relevant market as a first element. HOLMES, *supra*, § 3:4, p. 406. The inquiry has two dimensions: (1) identification of the cluster of products or services with which the defendant's product or service effectively competes, the "relevant product market," and (2) identification of the geographic area within which the

21

defendant practicably competes in marketing its product or service, the "relevant geographic market." *Id.* at 407.  Further, the relevant product market traditionally emphasizes two factors, the extent of substitutability and the degree of cross-elasticity of demand.  *Id.*  However, as with § 1, the relevant market inquiry ultimately requires consideration of various factors depending on the nature of the antitrust claim and the case-specific context.  *Id.* at 406-33.

In this case, plaintiff has defined the service product as "the hosting of large musical concerts, with over 3,000 fans, performed by nationally touring musicians (the 'Arena Musical Product'), within the West Michigan Market (the "Market"), which consists of the residents of the greater metropolitan areas of the cities of Grand Rapids, Muskegon, Kalamazoo and Battle Creek" (First Am. Compl. ¶ 8).  The Court is persuaded that plaintiff has pleaded a sufficient "relevant market" in light of the allegations, particularly given the early stage of these proceedings.

Similar considerations apply to defendants' arguments that plaintiff has failed to allege "market power," and anticompetitive effects and antitrust injury.  Until the claims in this case are further elucidated and the record further developed, dismissal is unwarranted on the basis that plaintiff has failed to plead these elements.

Plaintiff's specific allegations include that Live Nation controls as much as 90 percent of the Arena Musical Products in the Market in a given year and that through the PPA, CAA has been able to achieve actual monopoly power since Van Andel Arena hosts 75-80 percent of the total Arena Musical Products in the Market (First Am. Compl. ¶ 32).  It is undisputed that defendants' agreement with Live Nation has revenue sharing provisions directly involving not only their own contracts, but also their contracts with competitors.  Plaintiff essentially alleges that the PPA incentivizes their (defendants' and Live Nation's) mutual gain in the entertainment marketplace at

the expense of competitors and the competitive market.  Specifically, plaintiff alleges that the "Competitor Arena Revenue Siphoning" provision in the PPA has resulted in tens of thousands of dollars or more in revenue generated at the DeltaPlex being effectively siphoned from plaintiff to CAA (First Am. Compl. ¶ 22).  Plaintiff further alleges:

1.    that defendants' intended effect and purpose of entering into the PPA is to increase the cost of events at competitor arenas to their detriment and at the expense of the public by discouraging Live Nation from placing events at competitor arenas (First Am. Compl. ¶ 29);

2.    that the PPA has had the effect of some events that would otherwise come to West Michigan do not come at all or come at a higher cost to competitor arenas and/or the general public through increased ticket prices and/or a reduction in rent paid to competitors to cover the "cut" to CAA, which has denied access to Arena Musical Product and/or increased the Product's ticket costs (First Am. Compl. ¶ 30);

3.    that the PPA has a substantial, negative impact on the flow of interstate commerce (First Am. Compl. ¶ 31);

4.    that with the assignment of revenues from non-Live Nation events in the Van Andel Arena to Live Nation and the assignment of revenues to CAA from Live Nation events held at West Michigan Competitor Arenas, the PPA and the Competitor Arena Revenue Siphoning is a contract that unreasonably restrains trade or commerce in the Market and attempts to monopolize the placement of events in the Market and/or the revenues from events in the Market (First Am. Compl. ¶ 41); and

5. that defendants possess actual monopoly power over the Market, they intend to obtain monopoly power over the Market, or there is a dangerous probability that they will succeed in achieving monopoly power over the Market and a substantial part of interstate concert commerce through the PPA (First Am. Compl. ¶ 42).

Plaintiff's allegations, taken in total, sufficiently plead a plausible antitrust claim.

### c.  Going Forward

Defendant SMG provides the Court with a litany of citations to cases in which courts have dismissed antitrust claims on *Twombly* grounds.  While the list is impressive and may add bulk to defendants' argument, it does not add brawn.  Merely because antitrust claims falter statistically does not mandate that the claim in this particular case must fail.  But, moreover, because the case-specific context is critical to any reasoned analysis of an antitrust claim, such broad-based argument lends little support to defendants' motions for dismissal without a comparative analysis of each case.

Of equal concern to the Court, however, is plaintiff's melding of its antitrust allegations and theories.  While this is understandable to a certain extent given the circumstances of this case, the paucity of record facts, and the unique nature of the agreement at issue, the Court is mindful of the difficulties posed in responding logically and succinctly to such allegations, let alone the Court's difficulty in a detailed resolution of the issues in dispute.  Fundamentally, it appears to the Court that plaintiff's antitrust claims will succeed or fail on the basis of the parties' efforts to clarify their positions vis-à-vis the fundamental purpose of the antitrust law, as well as the elements of the specific theories advanced.

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It

rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of democratic, political and social institutions. Cases reviewing the legislative history of the Sherman Act have concluded that Congress, exercising the full extent of its constitutional power, sought to establish a regime of competition as the fundamental principle governing commerce in the United States.

17 McQuillin Mun. Corp. § 49:97 (3rd ed.) (footnotes omitted).

With regard to the substantive antitrust claims, and whether plaintiff has established a prima facie antitrust case, it is far too early to dismiss the claims on this basis because the record is not sufficiently developed to properly decide issues such as the relevant market and monopolization. Federal antitrust law is a complex area of law, often encumbered by complicated facts and economic market analyses. While this case is relatively narrow in its focus and allegations, it is factually unique, and thus does not fall neatly within established antitrust precedent. Whether plaintiff can establish a violation of federal antitrust law on the basis of the PPA remains to be seen. However, based on the pleadings and the parties' arguments, it is the Court's view that plaintiff has sufficiently pled the elements of its antitrust claims to survive the motions to dismiss.

Accordingly, the Court concludes that defendants are not entitled to dismissal of the antitrust claims on the basis of the pleading standard in *Twombly*. Plaintiff has pled a plausible antitrust claim.

### B.  42 U.S.C. § 1983 Claim (Count 3)

Defendants argue that plaintiff has failed to adequately plead a § 1983 claim. The Court agrees.

"A prima facie case under § 1983 has two elements: '(1) the defendant must be acting under the color of state law, and (2) the offending conduct must deprive the plaintiff of rights secured by

25

federal law.'" *Lambert,* 517 F.3d at 439 (citations omitted).  Defendants contend that plaintiff has failed to establish the second element.

Although plaintiff asserts its § 1983 claim based on procedural due process, substantive due process and equal protection (First Am. Compl. ¶¶ 67-69), plaintiff's claim is essentially based on a "taking" theory because of the alleged diminished value/use of its property.  Plaintiff argues that it has a property interest in the contractual revenues that CAA has siphoned without due process or equal protection.  Plaintiff's claim is novel, if not imaginative.  Plaintiff provides no authority that recognizes a "taking" under the circumstances of this case.  Contrary to plaintiff's argument, the Court does not find the authority based on a regulatory taking applicable under the facts alleged here.  This case, at the core, reasonably sounds in antitrust law, and should proceed, if at all, on that basis.  The Court therefore rejects plaintiff's novel § 1983 claim.

### C.  Declaratory Judgment (Count 4)

Plaintiff seeks a declaratory judgment that the PPA's Competitor Arena Revenue Siphoning is illegal and unenforceable as an *ultra vires* act under state law.  Plaintiff argues that the CFAA does not confer authority in CAA or any of its authorized agents, such as SMG, to "co-promote" Arena Musical Products in private facilities such as DeltaPlex.  Defendants argue that the Court should decline to exercise its discretion to provide the requested declaratory relief, i.e., that the PPA is not enforceable because it is *ultra vires*, since this is a question of state law and policy.

Similar to the § 1983 claim, plaintiff's request for a declaratory judgment appears to be tangential to plaintiff's case overall and depends on a somewhat imaginative characterization of the facts—that defendants are illegally co-promoting events at private facilities, placing tax dollars at risk and harvesting income from a private venture that is not subject to federal, state, or local tax.

This characterization does not comport with the actual facts or circumstances of this case.  For instance, the PPA guarantees CAA a minimum of 1.4 million dollars in revenue from Live Nation; thus, it can hardly be said to be a risk of tax dollars.  In any event, the declaratory judgment count seeks relief duplicative in part to that sought in plaintiff's antitrust claim.  As defendants observe, the declaratory relief requested implicates matters exclusively involving state law.  Given these circumstances, the Court concludes that this claim is properly dismissed.

### D.  State Law Claims (Counts 2, 5-7)

Finally, with regard to the remaining counts involving state law claims, the parties have not fully argued the merits of these claims.  Since certain of plaintiff's federal claims have survived dismissal, the Court need not address the issue of supplemental jurisdiction or whether these claims will ultimately survive on the merits.

### VI.  Conclusion

Accordingly, the Court denies defendants' motions to dismiss with respect to Count 1 (Violation of Federal Antitrust Act), Count 2 (Violation of State Antitrust Act), Count 5 (Tortious Interference with Prospective Business Advantage), Count 6 (Violation of Open Meetings Act and CFAA), and Count 7 (Violation of the Freedom of Information Act and CFAA) of plaintiff's First Amended Complaint.  The Court grants the motions to dismiss with respect to Count 3 (Violation of 42 U.S.C. § 1983) and Count 4 (Declaratory Judgment—PPA's Competitor Arena Revenue Siphoning is Ultra Vires) of plaintiff's First Amended Complaint.


DATED: January 30, 2009                      /s/ Janet T. Neff_____
                                             JANET T. NEFF
                                             United States District Judge

27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DELTA TURNER, LTD.,

                       Plaintiff,                          Case No. 1:08-cv-544

v.                                                      HON. JANET T. NEFF

GRAND RAPIDS - KENT COUNTY
CONVENTION/ARENA AUTHORITY
a Michigan Municipal Authority,
and SMG, a Pennsylvania General Partnership,

                       Defendants.
_____/

## <u>ORDER</u>

In accordance with the Opinion entered this date:

**IT IS HEREBY ORDERED** that the Court **DENIES IN PART** and **GRANTS IN PART** defendants' motions to dismiss (Dkts 40, 43) as follows:

The Court DENIES defendants' motions to dismiss with respect to Count 1 (Violation of Federal Antitrust Act), Count 2 (Violation of State Antitrust Act), Count 5 (Tortious Interference with Prospective Business Advantage), Count 6 (Violation of Open Meetings Act and CFAA), and Count 7 (Violation of the Freedom of Information Act and CFAA) of plaintiff's First Amended Complaint.

The Court GRANTS the motions to dismiss with respect to Count 3 (Violation of 42 U.S.C. § 1983) and Count 4 (Declaratory Judgment—PPA's Competitor Arena Revenue Siphoning is Ultra Vires) of plaintiff's First Amended Complaint.


DATED: January 30, 2009                          /s/ Janet T. Neff
                                                 JANET T. NEFF
                                                 United States District Judge

2